IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS,
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| DIAGNOSTIC AFFILIATES OF NORTHEAST HOU, LLC D/B/A 24 HOUR COVID RT-PCR LABORATORY | § § § § | |
| *Plaintiff*, | § § | C.A. No. 2:21-cv-00131 |
| v. | § § | |
| UNITED HEALTH GROUP, INC., ET AL | § § | |
| *Defendants.* | | |

**PLAINTIFF'S RESPONSE BRIEF IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS [DOC. 67] and [DOC. 68]**

Plaintiff Diagnostic Affiliates of Northeast Hou, LLC d/b/a 24 Hour Covid RT-PCR

Laboratory ("Plaintiff") respectfully submits this Response Brief in Opposition to both Motions to

Dismiss filed on September 24, 2021, by: (i) United[1] and the Employer Plans;[2] and (ii)

UnitedHealth Group Incorporated ("UHG"). For purposes of this Response, United and UHG shall

be collectively referred to as "United".

[INTENTIONALLY LEFT BLANK]

---

[1] *See* Defendants' Motion to Dismiss Plaintiff's Complaint and Brief in Support [Doc. 67]. "United" is defined as United HealthCare Services, Inc., UnitedHealthcare Benefits of Texas, Inc., UnitedHealthcare of Texas, Inc., UMR, Inc., and OptumHealth Care Solutions, LLC.

[2] *See* Defendants' Motion to Dismiss Plaintiff's Complaint and Brief in Support [Doc. 67]. The "Employer Plans" is defined as the Defendant employer-sponsored health benefit plans identified on Exhibit A of Defendants' Motion to Dismiss Plaintiff's Complaint and Brief in Support.

*Plaintiff Diagnostic Affiliates of Northeast Hou, LLC d/b/a 24Hour Covid RT-PCR-Laboratory's
Response to UHC's Motion to Dismiss*
**1** | P a g e

## PRELIMINARY STATEMENT

Simply stated, United is Goliath, and this Goliath's sole purpose as a publicly traded, for-profit company is to maximize its profits for the sole benefit of itself, its board, its executives, and its shareholders. United unfairly utilizes its vast infrastructure and nearly unlimited resources to keep its thumb on the scales by subjecting out-of-network ("OON") providers, like Plaintiff, to: (i) prejudicial claims adjudication, medical record review, and audit practices; (ii) futile internal administrative appeals processes; (iii) unfounded, bad faith, and far less than diligent investigations; and (iv) unlawful and inconsistent representations of its obligations to process claims in compliance with the terms of health plans and applicable laws.

The aforementioned processes are predetermined, manufactured, and controlled by United as if they were carnival games meant to rig outcomes that are beneficial to its bottom line. How else can United report profits of $4.3 billion in the second financial quarter of 2021 when scores of providers across the country are complaining of improper denials and underpayments for Covid Testing and other COVID-19 relates services while members of its health plans are simultaneously being saddled with financial responsibility for these same COVID-19 relates services that Congress ensured would be covered, in full, by the members' insurance companies. This is all counterintuitive.

A for-profit health insurance company is an oxymoron, so to speak. By their very nature, for-profit companies owe a fiduciary obligation to its stakeholders to act in their best interests, *i.e.*, to maximize profits and dividends to the stakeholders' financial benefit. In contrast, insurance companies owe a fiduciary obligation to its members to also act in their best interests, *i.e.*, to cover services covered under the terms of their health plan or mandated by federal or state laws. By way of example, the Employee Retirement Income Security Act of 1974 ("ERISA") requires fiduciaries

to: (i) discharge its duties with respect to health plans <u>solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries</u> and defraying reasonable expenses of administering health plans; and (ii) with the <u>care, skill, prudence, and diligence under the circumstances then prevailing</u> that a prudent man acting in a like capacity and familiar with such matter would use in the conduct of an enterprise of a like character and with like aims.

Denying thousands upon thousands of Covid Testing claims through some sham Improper Record Request Scheme thereby shifting financial responsibility to members of the United health plans is <u>not</u> solely acting in the interests of members and beneficiaries, rather, it <u>only</u> benefits United and its stakeholders as it leaves more money in their pockets. Further, these denials have not defrayed reasonable expenses of administering health plans, instead, United, through its failure to comply with the FFCRA, the CARES Act, ERISA, the ACA, Texas insurance laws, and the terms of the health plans it insures or administers, has incurred additional costs for itself and imposed additional costs on the Employer Plans and other self-funded health plans that it administers. These additional costs in "administering" health plans will ultimately be shifted back to the members of these United health plans through an increase of premiums and contributions. Cynicism aside, when premiums and contributions increase as a result of an insurers or administrators failures to comply with its obligations then additional expenses are incurred rather than defrayed and the members' interests are damaged.

In United's Motion to Dismiss, United states as follows:

Plaintiff conveniently omits that it refused to provide necessary provider demographic information in response to requests made by United on numerous occasions. Such requests would have allowed United to verify Plaintiff's credentials as a provider and the veracity of its operations. United has a contractual duty to perform this function as plan administrator on behalf of the Employer Plans and was permitted to do so under the FFCRA and the CARES Act.[3]

This statement is not only laughable, but representative of United's perversion and distortion of the facts of the carnival games it plays with OON providers, like Plaintiff, in order to manufacture an outcome for its own financial benefit. In the Original Complaint, Plaintiff allocates nearly eleven and half pages detailing United's Improper Record Request Scheme and its attempts to comply, in good faith, with the claim-by-claim record requests to the point of inundation and suffocation.[4] As of October 25, 2021, United has issued 5,530 claim-by-claim additional record request letters,[5] specifically requesting the following:

- Physician's orders for the laboratory test;

- Laboratory testing method, specimen type and test results related to all billed services;

- CLIA documentation, certificates, licenses, permits, etc.;

- Manufacturer and model number of the testing equipment used for billed services; and

- Manufacturer brand information for all test supplies used for billed.

---

[3] *See* Defendant's Motion to Dismiss Plaintiff's Complaint and Brief in Support [Doc. 67], Footnote 1.
[4] *See* Original Complaint and Jury Demand [Doc. 2], ¶¶ 101-131 (Page 38-49).
[5]



*Plaintiff Diagnostic Affiliates of Northeast Hou, LLC d/b/a 24Hour Covid RT-PCR-Laboratory's Response to UHC's Motion to Dismiss*

**4 | P a g e**

Plaintiff provided this requested information on approximately 2,000 claims, but it is unclear how many copies of its CLIA certificate or the number of times Plaintiff must provide the brand name of the nasal swabs it uses to collect specimens from its patients' noses before its operations are legitimized. Apparently 2000 is still not good enough, but what is the magic number? <u>Does United even know</u>?

United is correct that "plans and issuers may continue to employ programs designed to detect and address fraud and abuse."[6] However, after what point does this not become an absolute abuse of power? What is the threshold where <u>a program designed to detect and address fraud and abuse ceases from its purpose and transitions to becoming a fraudulent and abusive program</u> meant to design and manufacture impropriety on behalf of a provider thus allowing United to baselessly deny or underpay claims.

Additionally, in the Original Complaint, Plaintiff makes reference to two specific letters sent directly to Plaintiff from United's Special Investigations Unit for the purpose of "confirming the logistics and the capability of the laboratory to provide services to UHC [United] patients."[7] Plaintiff responded and provided proof of such response as an Exhibit to the Original Complaint.[8] Thus, again, United's statement that Plaintiff "conveniently omits" to providing certain requested information is absurd. What's more absurd is that certain requested information was also sent to United's Regulatory Affairs department without any follow-up from United,[9] and Plaintiff also

---

[6] See, e.g., U.S. DEP'T OF LABOR, DEP'T OF HEALTH AND HUMAN SERVICES, AND DEP'T OF TREASURY, FAQs About Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Act Implementation Part 44, Feb. 26, 2021, available at https://www.cms.gov/files/document/faqs-part-44.pdf ("To the extent not inconsistent with the FFCRA's prohibition on medical management, plans and issuers may continue to employ programs designed to detect and address fraud and abuse.").
[7] See Original Complaint and Jury Demand [Doc. 2], ¶ 107 (Page 40).
[8] See Exhibit B of the Original Complaint and Jury Demand, Doc. 2 [1-2], (United SIU Record Request Proof of Submission on November 17, 2020).
[9] See Exhibit F of the Original Complaint and Jury Demand, Doc. 2 [1-6], (Plaintiff's Email Exchange with United's Head of Regulatory Affairs Commencing on April 15, 2021).

inquired with United's Special Investigations Unit about the status of any investigation and if any additional information was required but was met with silence.[10]

United's aforementioned statement about Plaintiff conveniently omitting information and its sham dog and pony show investigation is illustrative of its actions throughout the course of the COVID-19 pandemic and the coverage of Covid Testing claims. It is beyond a shadow of doubt that Plaintiff submitted more than enough information needed to "verify Plaintiff's credentials and the veracity of its operations." Further, if United and its Special Investigation Unit actually wanted to conduct good faith investigations then it could have obtained Plaintiff's credentials, its applications and recertifications, its on-site inspection reports, and other relevant information needed to confirm the veracity of its operations, which is all publicly available information that may be requested from the Texas Department of Health and Human Services and the Centers for Medicare and Medicaid Services. United is correct that it has a contractual obligation to conduct investigations into the operations of providers, but no investigation was ever actually conducted, at least not with the care, skill, prudence, and diligence under the circumstances United so carefully attempts to manufacture.

Plaintiff respectfully asks the Court to review Plaintiff's Original Complaint, its Exhibits, and these Motion to Dismiss pleadings through the prism of this Preliminary Statement.

[INTENTIONALLY LEFT BLANK]

---

[10] *See* Exhibit C of the Original Complaint and Jury Demand, Doc. 2 [1-3], (Plaintiff Email to United re the Status of SIU Investigation dated May 19, 2021).

*Plaintiff Diagnostic Affiliates of Northeast Hou, LLC d/b/a 24Hour Covid RT-PCR-Laboratory's*
*Response to UHC's Motion to Dismiss*
**6** | P a g e

## **BACKGROUND**

Plaintiff is a CLIA certified high complexity laboratory that has requested emergency use authorization under Section 564 of the Federal Food, Drug, and Cosmetic Act; therefore, has all authorizations and/or approvals necessary to render and be reimbursed for Covid Testing services. At the height of the pandemic Plaintiff operated seven specimen collection sites located across the States of Texas and Louisiana and partnered with employers and independent school districts across Texas to render Covid Testing services to employees, teachers, students, and other staff members.

United provides health insurance and/or benefits to members of United Plans pursuant to a variety of health benefit plans and policies of insurance, including employer-sponsored benefit plans and individual health benefit plans. United also serves in the trusted role of third-party claims administrator for self-funded health plans, including the Employer Plans.

On March 13, 2020, the President issued Proclamation 9994 declaring a National Emergency concerning the COVID-19 outbreak with a determination that a national emergency exists nationwide, pursuant to Section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act.

To facilitate the nation's response to the COVID-19 pandemic, Congress passed the FFCRA and the CARES Act to, amongst other things, require group health plans and health insurance issuers offering group or individual health insurance coverage to: (i)  provide benefits for certain items and services related to diagnostic testing for the detection or diagnosis of COVID-19 without the imposition of any cost-sharing requirements (i.e. deductibles, copayments, and coinsurance) or prior authorization or other medical management requirements; and (ii) to reimburse any provider for Covid Testing an amount that equals the negotiated rate or, if the plan

*Plaintiff Diagnostic Affiliates of Northeast Hou, LLC d/b/a 24Hour Covid RT-PCR-Laboratory's*
*Response to UHC's Motion to Dismiss*
**7** | P a g e

or issuer does not have a negotiated rate with the provider (e.g. Plaintiff), the cash price for such service that is listed by the provider on its public website in accordance with 45 CFR § 182.40.

Since the start of the public health emergency and Congress's passing of the FFCRA and the CARES Act, United has consistently made public-facing representations regarding its obligations to comply with the requirements of the FFCRA and the CARES Act and to process Covid Testing claims accordingly. These representations can be found on United's websites and other publications. Unfortunately, United's conduct throughout the course of this pandemic has not aligned with its public statements.

Plaintiff filed its Original Complaint on June 29, 2021, and a brief summary of the accusations against United and/or the Employer Plans are as follows:

1. United and the Employer Plans have generally failed to comply with the requirements of Sections 6001 of the FFCRA and Section 3202(a) of the CARES Act;

2. United's institution of an Improper Record Request Scheme whereby United overwhelms OON providers, like Plaintiff, with improper, irrelevant, and burdensome medical record requests for the sole purpose of denying as many claims for bona fide Covid Testing services submitted by Plaintiff as possible;

3. United's arbitrary and inconsistent review of requested records supporting the rendering of Covid Testing services;

4. United and the Employer Plans' failure to properly respond and/or engage Plaintiff on its concerns regarding the Improper Record Request Scheme and United's "investigation" into Plaintiff's operations;

5. United's inconsistent adjudication of Covid Testing claims;

6. United's meritless and futile internal administrative appeals process;

7. United's misrepresentations of its obligations to comply with the FFCRA and the CARES Act to Plaintiff, member of health plans insured or administered by United, and to the Employer Plans and other self-funded health plans it administers; and

8. United's pattern of racketeering activity and its multiple, repeated, and continuous use of the mails and wires in furtherance of the Improper Record Request Scheme,

meritless claims and appeals processes, its disinformation campaign in violation of 18 U.S.C. §§ 1341 and 1343, and embezzlement and/or conversion of self-funded plans assets through its CRS Benchmark Program in violation 18 U.S.C. § 664.

9.    The Employer Plans, through their silence and inaction, are dually liable for United's violations of the FFCRA, the CARES Act, and ERISA pursuant to 29 U.S.C. § 1105(a).

Plaintiff has submitted over 10,000 Covid Testing claims to United for reimbursement, and the majority of claims have been denied/stalled through United's Improper Record Request Scheme in violation of Section 6001 of the FFCRA, and, for those Covid Testing claims that United has paid, the majority of them have been underpaid in violation of Section 3202(a) of the CARES Act. Plaintiff is owed more than $12 million in denied and underpaid Covid Testing claims. Despite Plaintiff's efforts to resolve any concerns regarding the veracity of its operations and to negotiate an amount to be paid on Covid Testing claims with United, United turned a cold shoulder to Plaintiff, and now looks to cobble together a defense despite all its missteps.

United's conduct is a direct affront to Congress's intentions of passing the FFCRA and the CARES Act during the heat of the pandemic, and Plaintiff should not be left without any recourse.

[INTENTIONALLY LEFT BLANK]

## LEGAL ARGUMENT

### I.     LEGAL STANDARD

In evaluating the Motions to Dismiss, the Court must accept as true all well-pleaded facts in the complaint and view the allegations as a whole in the light most favorable to the non-movant.[11] Importantly the Fifth Circuit has "consistently disfavored dismissal under Rule 12(b)(6)."[12] To survive a motion to dismiss a complaint should only be dismissed if it fails to include allegations "that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged."[13]

A complaint attacked by a Rule 12(b)(6) motion to dismiss "does not need detailed factual allegations" or "heightened fact pleading of specifics.[14] Rather, courts require "only enough facts to state a claim for relief that is plausible on its face."[15] A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged."[16]

As shown below, the detailed allegations of the Original Complaint are more than sufficient to state viable FFCRA/CARES Act, ERISA, RICO, and state law claims.

### II.    PLAINTIFF HAS AN IMPLIED RIGHT OF ACTION UNDER THE FFCRA AND THE CARES ACT

In its Motions, United and the Employer Plans do not dispute that the FFCRA requires it to cover diagnostic testing and related services, without imposing any cost sharing requirements,

---

[11] *See Scanlan v. Texas A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).
[12] *Id.*
[13] *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 642 (S.D. Tex. 2016).
[14] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).
[15] *Id.*
[16] *Ashcroft v. Iqbal*, 556 U.S. 552, 678 (2009); *Twombly*, 550 U.S. at 556.

prior authorization, or other medical management requirements.[17] Nor do they dispute that the CARES Act requires it to reimburse laboratories like Plaintiff for Covid Testing and related services at either "the negotiated rate" with the provider or at "the cash price for such service as listed by the provider on a public internet website."[18] United and the Employer Plans do not even dispute that it did not pay (or it significantly underpaid) Plaintiff for Covid Testing services and instead instituted its Improper Record Request Scheme for nearly every Covid Test Plaintiff provided. United and the Employer Plans cannot defend itself on this turf because the FFCRA and the CARES Act unequivocally prohibit United and the Employer Plans from engaging in this conduct—the statutes provide United and the Employer Plans with no discretion to deny claims for Covid Testing or to pile on clinical documentation requests in lieu of paying. Instead, United and the Employer Plans offer the audacious argument that it cannot be held liable for its misconduct because Plaintiff lacks an avenue for redress. United and the Employer Plans contend the statutes do not provide a private right of action, but United and the Employer Plans also do not (and cannot) explain what Plaintiff's alternative is. United and the Employer Plans' position is untenable, and Plaintiff has an implied right of action under the FFCRA and the CARES Act.

The possibility of an implied right of action is analyzed under the following four-part test:

1. Is this plaintiff a member of the class for whose "especial" benefit the statute was passed. In other words, does the statute create a federal right for this plaintiff?

2. Is there any evidence of legislative intent, either explicit or implicit, to create or deny a private remedy?

3. Is it consistent with the legislative scheme to imply a private remedy?

---

[17] *See* FFCRA, § 6001(a).
[18] *See* CARES Act, § 3202(a).

4.  Is the cause of action one traditionally relegated to state law so that implying a federal right of action would be inappropriate?[19]

The FFCRA and the CARES Act plainly create a benefit for the class of persons of which Plaintiff is a member: OON providers who furnish COVID testing. The statute straightforwardly directs insurers like United and the health plans United administers (*e.g.* the Employer Plans) to pay OON providers who furnish Covid Testing. Importantly, the statutes go further, describing how the amount such providers must be paid will be calculated. It states that "such plan or issuer <u>shall</u> reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website . . . [emphasis added]." This provision "grant[s] private rights to members of an identifiable class."[20] Unlike the provision found insufficient to create a private right of action in *Transamerica*, this one "create[s] or alter[s] any civil liabilities."[21] Additionally, the statutes clearly direct health plans and insurers like United to reimburse providers like Plaintiff for Covid Testing. *See Maine Community Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.' Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."). The CARES Act goes on to specify the rate the health plan or insurer must pay an out-of-network provider: "If the health plan or issuer does not have a negotiated rate with such provider, <u>such plan or issuers shall reimburse the provider</u> in an amount that equals the cash price for such service as listed by the provider on a public internet website, or such plan or issuer may negotiate a rate with such provider for less than such cash price [emphasis added]."[22] Thus, the

---

[19] *Lundeen v. Mineta*, 291 F. 3d 421, 433 (S.D. Tex. 2020) (quoting *Louisiana Landmarks Society, Inc., v. City of New Orleans*, 85 F.3d 1119, 1122-23 (5th Cir. 1996)).
[20] *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. at 24.
[21] *Id*. at 19.
[22] CARES Act, § 3202(a)

statutes evidence Congress's intent to create a personal right in OON providers like Plaintiff who provide Covid Testing services and have the right to be reimbursed at the statutorily mandated amount.

With respect to the second factor to be considered, there appears to be limited extrinsic evidence of legislative intent one way or the other on the issue of a private cause of action with respect to the particular provisions at issue here, other than the language used. But the language used reflects a legislative intent that is in fact consistent with providing a private right of action because Congress specifically identified a discrete group and then used language giving that group a right to reimbursement. It is only logical to assume that if the group is denied the right granted to it by Congress, they will have a remedy. The lack of more specificity is not surprising, given the emergency Congress faced, the need for immediate decisive action, and the overall complexity of the entire statutory schemes, which primarily focused on economic relief, of which the specific provision we focus on in this case is but a tiny part.

Nor can there be any question that a private right of action is "consistent with the underlying purposes of the legislative scheme." As described above, Congress wanted providers to be confident that if they participated in the national effort to combat the pandemic through widespread testing and diagnosis, they would be reimbursed appropriately. Such assurance was essential given the extensive costs (not to mention the personal risk) providers faced in setting up broad testing capability. Congress was well aware that, if left to their own devices, insurance companies would protect their economic interests and do what they could to avoid paying for the massive testing required to defeat the disease. Accordingly, Congress specifically removed nearly all discretion and back doors that insurers might use to avoid coverage. Congress wanted widespread testing, and they wanted insurers to pay for it.

United and the Employer Plans contend that Congress entrusted enforcement responsibility to impartial federal agencies, but it fails to explain what processes providers can use to seek a remedy. United and the Employer Plans point to no set of agency rules or processes Plaintiff could follow to obtain redress for United and the Employer Plans' failures to pay for Covid Testing claims. United also contends that an express private right of action against unlawful termination under the Fair Labor Standards Act cuts against finding an implied right of action under the FFCRA.[23] But Section 5105(b)(2) of the FFCRA that United is focused on provides for enforcement against employers and, again, is an entirely different set of obligations than those imposed on health plans and insurers under the FFCRA and the CARES Act. These provisions have nothing to do with Plaintiff's ability to vindicate its specific right to reimbursement from United and the Employer Plans for Covid Testing services and ultimately fail to provide Plaintiff the ability to challenge United's misconduct.

Had the law been written as United and the Employer Plans now urge this Court to interpret it – insurers and health plans should pay providers for Covid Testing services, but if they don't, the providers have absolutely no recourse beyond asking the Department of Labor to fine the insurers or health plans – it is inconceivable that sufficient resources would have been invested to reach the level of testing Congress hoped for. It is simply beyond cavil that allowing providers to sue to enforce the right to payment granted them by the CARES Act is consistent with the act's purposes.

Nor is this lawsuit an action of the type "traditionally relegated to state law." Actions by healthcare providers to enforce federal rights to payment for healthcare services flood the federal

---

[23] *See* Defendant's Motion to Dismiss Plaintiff's Complaint and Brief in Support [Doc. 67] at 7.

*Plaintiff Diagnostic Affiliates of Northeast Hou, LLC d/b/a 24Hour Covid RT-PCR-Laboratory's*
*Response to UHC's Motion to Dismiss*
**14** | P a g e

courts, in the context of government funded plans, ERISA plans and related healthcare legislation. Not surprisingly, United does not argue to the contrary.

Moreover, if there were no private right of action, patients and medical providers would be left remediless. The statute intended to prevent medical providers from directly billing the patients here, but that is apparently what United wants. This is inappropriate.[24]

United and the Employer Plans point to several recent cases in which courts outside the Southern District of Texas (with exception to one case)[25] have declined to find an implied right of action under unrelated provisions of the CARES Act.[26] But United fails to mention that each of these cases deals with provisions of the CARES Act other than the specific provision that Plaintiff seeks to enforce and are thus wholly inapplicable to Plaintiff's claims. For example, in *Matava v. CTPPS, LLC*, a pro se plaintiff filed a three paragraph complaint against a landlord that cited to the CARES Act and various other federal laws without containing any cause of action or substantive claims. The court did not provide any analysis of Section 3202 of the CARES Act in dismissing the complaint for lack of subject matter jurisdiction.[27] Likewise, the other cases on which United relies—*American Video Duplicating, Inc. v. City National Bank; Profiles, Inc. v. Bank of Am. Corp.*; and *Shehan v. U.S. Dept. of Justice*—all analyze whether the specific sections of the CARES Act dealing with the Paycheck Protection Program ("PPP") provide a private right of action.[28] The PPP, established by the CARES Act, provided loans to small business during the

---

[24] *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 76 (1992) (finding private right of action for money damages under Title IX because administrative process would leave complainant "remediless").
[25] *Daniel T.A. Cotts PLLC v. Am. Bank, N.A.*, No. 2:20-CV-185, 2021 WL 2196636, at *5 (S.D. Tex. Feb. 9, 2021)
[26] *See* [Doc. 67] at 7.
[27] *Matava v. CTPPS, LLC*, 3:20-CV-01709, 2020 WL 6784263, at *1 (D. Conn. Nov. 18, 2020).
[28] Indeed, in American Video Duplicating, Inc., the court concluded that the plaintiff had no right to an agent fee from defendants. In reaching this conclusion, the court noted that the CARES Act provision dealing with the PPP—which stated what fees an agent "may . . . collect"—uses language that "does not create an independent entitlement for agent fees." No. 2:20-cv-04036, 2020 WL 6882735, at *2 (C.D. Cal. Nov. 20, 2020). "If Congress had wanted to require lenders to pay agent fees, it could easily have provided that lenders 'shall' pay those fees, just as it provided that the

public health emergency to allow them to maintain their payroll, hire back employees, and cover mortgages, rent, and utilities.[29] United fails to explain how a court's determination that the CARES Act sections addressing the PPP's lack a private right of action results in the conclusion that OON providers lack a private right of action under Section 6001 of the FFCRA and Section 3202 of the CARES Act.

In short, Congress did not give health plans and health insurance issuers any discretion in determining whether they can cover Covid Testing and related services and how much to pay providers for such services. In the context of a public health emergency, the federal government sought to encourage extensive and swift Covid Testing and to incentivize providers like Plaintiff to accept the inherent risks in providing these tests by ensuring they would be paid promptly at a rate set by law. The FFCRA and the CARES Act mandate that plans and insurers like United and the Employer Plans cover these tests at the lab provider's cash price as posted on its website or the negotiated rate. Moreover, knowing of the risk that health plans like United would attempt to line their coffers by imposing burdensome obstacles on patients and providers who seek payment for testing, the federal government warned that plans and issuers shall not attempt to "limit or eliminate other benefits . . . to offset the costs of increasing the generosity of benefits related to the diagnosis and/or treatment of COVID-19."[30] Accordingly, it is in keeping with the text, structure, context, and policy of Section 6001 of the FFCRA and Section 3202 of the CARES Act to conclude that Plaintiff has a private right of action against United.

---

Small Business Administration 'shall' pay fees to lender." Id. (citations omitted). Here, Section 3202 uses such mandatory language in requiring that the "plan or issuers shall reimburse the provider . . . ." CARES Act, § 3202(a)(2) (emphasis added). Thus, the CARES Act language addressing the PPP is substantially different than the language guaranteeing providers' right to payment for Covid Testing.

[29] See U.S. Dept. of Treasury, Paycheck Protection Program, available at https://home.treasury.gov/policy-issues/coronavirus/assistance-for-small-businesses/paycheckprotection-program.

[30] See FAQs, Part 42 (April 11, 2020).

*Plaintiff Diagnostic Affiliates of Northeast Hou, LLC d/b/a 24Hour Covid RT-PCR-Laboratory's*
*Response to UHC's Motion to Dismiss*
**16** | P a g e

III.    STANDING TO CHALLENGE VIOLATIONS OF THE FFCRA AND CARES ACT
        UNDER ERISA

Regardless of whether Plaintiff has a private right of action under the FFCRA and the

CARES Act, Plaintiff is also entitled to challenge United's unlawful practices through the private

rights of action provided under ERISA. Specifically, ERISA § 502(a)(1)(B), 29 U.S.C. §

1132(a)(1)(B) permits a plan participant or beneficiary to bring a civil action to recover plan

benefits, enforce his or her rights under the plan, or clarify rights to future benefits. "Congress's

creation of this cause of action has given patients a right to enforce the insurance coverage they

contracted for. They were given a right to recompense for an actual injury and have standing to

pursue alleged breaches of this statutory duty."[31] ERISA § 502(3), 29 U.S.C. § 1132(a)(3) further

permits a plan participant or beneficiary to seek to "enjoin any act or practice which violates any

provision" of ERISA or the terms of the plan, or "to obtain other appropriate equitable relief" to

"redress such violations or . . . enforce any provisions" of ERISA.

    A.      Plaintiff's Standing to Assert an ERISA Claim for Benefits

            i.      *Derived Standing from Validly Executed Assignment of Benefits*

Congress, the Department of Labor, Health and Human Services, and the Treasury

(collectively, the "Departments") have clearly established that Section 6001 of the FFCRA, as

amended by Section 3201 of the CARES Act, applies to group health plans and health insurance

issuers offering group or individual health insurance coverage, and the term "group health plan"

includes both insured and self-insured group health plans and employment-based health plans

subject to ERISA.[32] If Congress did not intend ERISA or its statutory remedies to not to be

---

[31] *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 194 (5th Cir. 2015)
[32] *See* FAQs, Part 42 (April 11, 2020).

*Plaintiff Diagnostic Affiliates of Northeast Hou, LLC d/b/a 24Hour Covid RT-PCR-Laboratory's
Response to UHC's Motion to Dismiss*
**17** | P a g e

incorporated into the FFCRA and the CARES Act then Congress would have specifically carved out the requirements for group health plans subject to ERISA to comply with the requirements of Section 6001 of the FFCRA and Section 3202(a) of the CARES Act rather than explicitly include them. As such, because Covid Testing services is now a federally mandated benefit that is required to be covered by any and all group health plans subject to ERISA, any failure by a group health plan subject to ERISA to properly adjudicate claims for Covid Testing services and reimburse a provider in accordance with how such benefit should be covered subjects the group health plan to an ERISA claim for benefits.

"It is well established that a healthcare provider, though not a statutorily designated ERISA beneficiary, may obtain standing to sue derivatively to enforce an ERISA plan beneficiary's claim."[33] Here, Plaintiff has standing because it routinely receives broad assignments of benefits from *many*[34] of its patients, and not *some* as United and the Employers Plans misrepresent in their Motions to Dismiss. Many patients includes, but is not limited to, patients that are members of group health plans that are Defendants identified in this action. At this phase, Plaintiff is not required to present or specify the particular claims or the particular Employer Plans for which it has obtained assignments, rather, it must plead that validly executed assignment of benefits documents have been obtained.[35]

The Fifth Circuit has maintained that "ERISA health care benefits are assignable,"[36] and "that the ability of patients to assign their claims to medical providers is both permissible <u>and</u>

---

[33] *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Employee Health Care Plan*, 426 F.3d 330, 333–34 (5th Cir. 2005).
[34] Original Complaint and Jury Demand [Doc. 2], ¶ 102 (Page 38).
[35] Original Complaint and Jury Demand [Doc. 2], ¶ 102 (Page 38).
[36] Cell Sci. Sys. Corp. v. Louisiana Health Serv., 804 F. App'x 260, 264 (5th Cir. 2020) (quoting *Hermann Hosp. v. MEBA Med. & Benefits Plan*, 845 F.2d 1286, 1289 (5th Cir. 1988) (Hermann I )).

beneficial [emphasis added]."[37] The purpose of designating Plaintiff as an authorized representative and assignee is to allow it to be able to pursue a full range of legal and administrative remedies in the event of any adverse benefit determination."[38] As part of the assignment of benefits executed by patients, the patients: (i) acknowledge that Plaintiff is an OON provider, (ii) designates Plaintiff as its authorized representative; and (iii) assigns and authorizes Plaintiff the right to be directly reimbursed for Covid Testing services. As a result, by virtue of the validly executed assignment of benefits, Plaintiff has standing to pursue an ERISA claim for benefits against United and the Employer Plans, especially since the Fifth Circuit has taken the following position:

> To deny standing to health care providers as assignees of beneficiaries of ERISA plans might undermine Congress's goal of enhancing employees' health and welfare benefit coverage. Many providers seek assignments of benefits to avoid billing the beneficiary directly and upsetting his finances and to reduce the risk of non-payment. If their status as assignees does not entitle them to federal standing against the plan, providers would either have to rely on the beneficiary to maintain an ERISA suit, or they would have to sue the beneficiary. Either alternative, indirect and uncertain as they are, would discourage providers from becoming assignees and possibly from helping beneficiaries who were unable to pay them "up-front." The providers are better situated and financed to pursue an action for benefits owed for their services. Allowing assignees of beneficiaries to sue under § 1132(a) comports with the principle of subrogation generally applied in the law.[39]

ii.    *Conferred Standing from the FFCRA and the CARES Act to Sue Under ERISA*

Additionally, under the unique circumstances of this case, the relevant federal legislation makes clear that medical providers have standing to sue for an insurer's violation of the law. As described in detail above, the goal of the FFCRA and the CARES Act's approach to COVID testing was to remove any financial burden from the patients. The Departments specifically provide the

---

[37] *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 195 (5th Cir. 2015)
[38] *See Outpatient Specialty Surgery Partners, Ltd. v. Unitedhealthcare Ins. Co.*, No. 4:15-CV-2983, 2016 WL 3467139, at *4 (S.D. Tex. June 24, 2016)
[39] *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Emp. Health Care Plan*, 426 F.3d 330, 337 (5th Cir. 2005) (quoting *Hermann Hosp. v. MEBA Med. & Benefits Plan* ("Hermann I"), 845 F.2d 1286, 1289 n. 12 (5th Cir.1988).

following guidance as it relates to coverage of Covid Testing services and Congress's intention of setting a specific reimbursement methodology for reimbursement for such services as to avoid from OON providers having to bill patients:

> **Q9. Does section 3202 of the CARES Act protect participants, beneficiaries, and enrollees from balance billing for a COVID-19 diagnostic test?**
>
> The Departments read the requirement to provide coverage without cost sharing in section 6001 of the FFCRA, together with section 3202(a) of the CARES Act establishing a process for setting reimbursement rates, as intended to protect participants, beneficiaries, and enrollees from being balance billed for an applicable COVID-19 test.  Section 3202(a) contemplates that a provider of COVID-19 testing will be reimbursed either a negotiated rate or an amount that equals the cash price for such service that is listed by the provider on a public website.  In either case, the amount the plan or issuer reimburses the provider constitutes payment in full for the test, with no cost sharing to the individual or other balance due.  Therefore, the statute generally precludes balance billing for COVID-19 testing.  However, section 3202(a) of the CARES Act does not preclude balance billing for items and services not subject to section 3202(a), although balance billing may be prohibited by applicable state law and other applicable contractual agreements.[17]
>
> 40

Regardless of whether valid assignment of benefits has been obtained from members of the United and Employer Plans' health plans that are subject to ERISA, a federal court lacks jurisdiction to hear the case in the event a valid and enforceable anti-assignment clause is in included in the term of the plan or the summary plan description.[41] Assuming each of the health plans at issue in this action includes a valid anti-assignment provision then a putative assignment to any healthcare provider by a member is invalid and cannot bestow the provider with standing to sue under the plan.[42] As a result, United and the Employer would be free to completely disregard its obligations to cover and reimburse Covid Testing services performed by any OON provider – not just Plaintiff – and the only recourse OON providers would have is to bill patients.

---

[40] *See* FAQs, Part 43 (June 23, 2020).
[41] *See Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 250 (5th Cir. 2019);*See also LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.*, 298 F.3d 348, 353 (5th Cir. 2002).
[42] *LeTourneau* at 352–53.

The FFCRA and the CARES Act were passed in response to the public health emergency declared under Section 319 of the Public Health Service Act. The purpose of including Section 6601 of the FFCRA and Section 3202(a) of the CARES Act was to two-fold: (1) to motivate and to provide reasonable assurances to providers capable of providing Covid Testing services that they would be reimbursed for the Covid Testing services it rendered throughout the course of the public health emergency; and (2) to provide reasonable assurances to members of health plans that they would not be held personally financially responsible for Covid Testing services as it would disincentivize persons from being tested, in turn, further exacerbating the pandemic. This conscious decision by Congress to eliminate the patient from the reimbursement chain in OON Covid Testing situations obviates the ordinary requirement for an OON provider to obtain a valid assignment, and, in the event there is an anti-assignment provision in the terms of the health plan – which there usually is – to obtain a validly executed and notarized special power of attorney.

Surely, Congress has not intended that the only manner in which an OON provider could contest a group health plan's failure to comply with the applicable requirements of the FFCRA and the CARES Act under ERISA is through a validly executed and notarized special power of attorney. Plaintiff took heed of Congress's call to action to healthcare providers to assist in testing to curve the pandemic, and, over the course of the pandemic, has provided Covid Testing services on nearly 200,000 ocassions. However, was it also Congress's expectation that Plaintiff obtain executed and notarized special powers of attorney on each and every one of these nearly 200,000 occasions? The operational and administrative logistical undertaking in obtaining notarized instruments from every patient is an impossibility for the most sophisticated providers especially at the scale Plaintiff provided Covid Testing services. The FFCRA and the CARES Act should and must obviate the need of a validly signed assignment document, or, more importantly, an

executed and notarized special power of attorney. Respectfully, this Court must rule that these emergency laws passed in the midst of a public health emergency have special exception, and confer standing to Plaintiff, and other similarly situated providers, to pursue this remedy under ERISA.

      **B.**      **Deemed Exhaustion of Administrative Claims and Appeals Processes**

Pursuant to 29 C.F.R. § 2560.503-1(b), group health plans subject to ERISA are obligated to establish and maintain reasonable claims procedures, and such claims procedures will be deemed exhausted if, amongst other things: (i) claims procedures are not administered in a way that unduly inhibits or hampers the initiation or processing of claims for benefits;[43] (ii) claims procedures do not contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants;[44] (iii) the manner and content of benefit determinations do not comply with certain notice criteria;[45] and (iv) appeals of adverse benefit determinations are not taking into account all comments or materials submitted on appeal.[46] Failure to establish and follow the reasonable claims procedures consistent with 29 C.F.R. § 2560.503-1 shall be deemed to have exhausted the administrative remedies available and shall be entitled to pursue any available remedies under ERISA Section 502(a) on the basis that the plan(s) has failed to provide reasonable claims procedures that would yield a decision on the merits of the claim.

---

[43] *See* 29 C.F.R. § 2560.503-1(b)(3)
[44] *See* 29 C.F.R. § 2560.503-1(b)(5)
[45] *See* 29 C.F.R. § 2560.503-1(g)
[46] *See* 29 C.F.R. § 2560.503-1(h)(iv)

Additionally, pursuant to 45 C.F.R. § 147.136, group health plans and health insurance issuers in group and individual markets must also comply with minimum internal claims and appeals processes, and such processes will be deemed exhausted if, amongst other things: (i) the processes do not comply with 29 C.F.R. § 2560.503-1;[47] and (ii) decisions are not made in a manner that avoid conflicts of interest or impartiality.[48] Failure to establish and follow the reasonable claims procedures consistent with 45 C.F.R. § 147.136(b)(2) shall be deemed to have exhausted the administrative remedies available and shall be entitled to pursue any available remedies under ERISA Section 502(a) on the basis that the plan(s) has failed to provide a reasonable claims and appeals process that would yield a decision on the merits of the claim.

In *Theriot v. Building Trades United Pension Trust Fund*, the Fifth Circuit states that "if the plan administrator failed to establish or follow claims procedures consistent with ERISA's requirement, a claimant is excused from failing to exhaust administrative remedies.[49] At a minimum, United and the Employer Plans are alleged to have: (i) instituted an Improper Record Request Scheme in violation of 29 C.F.R. § 2560.503-1(b)(3);[50] (ii) inconstantly adjudicated the same or substantially similar Covid Testing claims of members belonging to the same health plans, products, and/or groups in violation of 29 C.F.R. § 2560.503-1(b)(5);[51] (iii) the manner and content of benefit notifications to Plaintiff did not provide the specific reason for adverse benefit determination, failed to provide or make reference to materials relied upon in the adjudication/determination, and failed to provide materials that were requested throughout the

---

[47] *See* 45 C.F.R. § 147.136(b)(2)(i).
[48] *See* 45 C.F.R. § 147.136(b)(2)(ii)(D).
[49] *Theriot v. Building Trades United Pension Trust Fund*, 850 Fed.Appx. 231, 235.
[50] *See* Original Complaint and Jury Demand [Doc. 2], ¶¶ 101 – 131 (Page 38-49).
[51] *See* Original Complaint and Jury Demand [Doc. 2], ¶¶ 132 – 140 (Page 49-53).

entirety of the claims procedures in violation of  29 C.F.R. § 2560.503-1(g);[52]and the internal administrative appeals process is operated without any merit as it fails to consider any comments or materials submitted on appeal in violation of 29 C.F.R. § 2560.503-1(h)(iv).[53]

Pursuant to 45 C.F.R. § 147.136(b)(2), the minimum internal claims and appeals processes should also be deemed exhausted for the same aforementioned reasons as it relates to 29 C.F.R. § 2560.503-1, and United and the Employer Plans' internal claims and appeals processes are far from impartial and riddled with conflicts of interests in violation of 45 C.F.R. § 147.136(b)(2)(ii)(D).[54]

United and the Employer Plans internal claims and appeals processes should also be deemed as exhausted because United failed to respond, within ten days, to Plaintiff's written request for a written explanations of United and the Employer Plans' patterns and practices of violating the FFCRA, the CARES Act, and ERISA pursuant to 45 C.F.R. § 147.136(b)(2)(ii)(F)(2). As detailed above, patients of Plaintiff execute a valid assignment of benefits designating Plaintiff as its authorized representative, *i.e.* a "claimant."[55] Despite Plaintiff's request for a written explanation in the capacity of a claimant no response was ever provided by United either in its capacity an insurer or as an administrator for the Employer Plans and other self-funded health plans.[56] Additionally, United failed to inquire with Plaintiff about its status as a claimant and its standing to make such a written request; therefore, any argument made by United or the Employer Plans in an attempt to establish that the internal claims and appeals process should not be deemed exhausted pursuant to 45 C.F.R. § 147.136(b)(2)(ii)(F)(2) has been waived.

---

[52] *See* Original Complaint and Jury Demand [Doc. 2], ¶¶ 101 – 155 (Page 38-58).
[53] *See* Original Complaint and Jury Demand [Doc. 2], ¶¶ 141 – 155 (Page 53-58).
[54] *See* Original Complaint and Jury Demand [Doc. 2], ¶¶ 160-187 (Page 60-71).
[55] *See* 45 C.F.R. § 147.136(a)(2)(iii).
[56] *See* Exhibit F to Original Complaint and Jury Demand Doc. 2 [1-6].

### ii.     Futility of Administrative Appeals Process

A claimant is excused from demonstrating exhaustion if she can show that pursuit of administrative remedies would have been futile.[57] To qualify for the futility exception to the exhaustion requirement, the claimant must show a "certainty of an adverse decision."[58] The claimant is also required to show hostility or bias on the part of the administrative review committee.[59] The focus of futility is on the bias in the review process, not based on company officials' views.[60]

In the Original Complaint, Plaintiff details its utilization of and experiences with the internal administrative appeals process, and, of the hundreds of appeals submitted to United, only one Covid Testing claim has been overturned.[61] Given that only one, or at the most a fraction, of appeals have been overturned, it is beyond a certainty that every Covid Testing claims that is appealed will result in the upholding of United's adverse benefit determination. Additionally, Plaintiff pleads with sufficient specificity allegations of fraud and racketeering against United throughout the entirety of the Original Complaint; therefore, Plaintiff has sufficiently pled that hostilities and bias exist in United's administrative review process.

## IV.     PLAINTIFF PLEADS A VIABLE CLAIM FOR FAILURE TO PROVIDE A FULL AND FAIR REVIEW

The Court should also deny United and the Employer Plans' motions to dismiss Count III, alleging that United and the Employer Plans violated their requirements to provide a full and fair

---

[57] *Bourgeois v. Pension Plan for Employees of Santa Fe Int'l Corps.*, 215 F.3d 475, 479 (5th Cir. 2000).

[58] *Id.* (citing *Commc'ns Workers of Am.*, 40 F.3d at 433) (emphasis in original); see also *Rando v. Standard Ins. Co.*, 182 F.3d 933 (10th Cir. 1999); *Lindemann v. Mobil Oil Corp.*, 79 F.3d 647, 650 (7th Cir. 1996).

[59] *McGowin v. ManPower Int'l, Inc.*, 363 F.3d 556, 559 (5th Cir. 2004).)

[60] *Bourgeois*, 40 F.3d at 479−80 (reasoning that a "company's preclusive interpretation ... does not establish that the actual Committee would not have considered his claim.").

[61] *See* Original Complaint [Doc. 2], ¶¶ 141-155; *See also* Exhibit P of the Original Complaint Doc 2 [1-16].

review of claims under ERISA Section 503. This Section requires every employee benefit plan to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."[62] Plaintiff alleges a series of actions by United and the Employer Plans in violation of this duty and 29 C.F.R. § 2560.503-1. Therefore, Plaintiff's claim for a full and fair review should not be disregarded despite Plaintiff's ERISA 502(a)(1)(B) claim.

## V.     PLAINTIFF PLEADS A VIABLE RICO CLAIM

Plaintiff more than sufficiently pleads its RICO claim against United in Count IV. "RICO is to read broadly" and "liberally construed to effectuate its remedial purposes."[63] Moreover, the Supreme Court has "repeatedly refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe.[64] United's conduct fits squarely within the text and intended scope of the statute.

### A.     Plaintiff Pleads a Viable Section 1962(c) Claim

"RICO makes it 'unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'"[65] RICO allows "'[a]ny person injured in his business or property by reason of a violation of section 1962' to bring a civil suit for treble damages."[66] "To state a claim under § 1962(c), a plaintiff must adequately plead that the defendant engaged in '(1) conduct (2) of an

---

[62] 29 U.S.C. § 1133(2).
[63] *Sedima SP RL v. Imrex CO.*, 473 U.S. 479, 497-98 (1985).
[64] *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008).
[65] 18 U.S.C. § 1962(c); *Molina-Aranda v. Black Magic Enterprises, L.L.C.*, 983 F.3d 779, 784 (5th. Cir. 2020).
[66] 18 U.S.C. § 1964(c); *Id.*

enterprise (3) through a pattern (4) of racketeering activity.'"[67] Given the allegations against United as detailed in Plaintiff's Original Complaint and the gravity of this RICO cause of action, United says very little in its Motions to Dismiss about the viability of this claim. United's arguments with respect to Plaintiff's RICO claim are as follows: (i) Plaintiff did not plausibly allege that the RICO violations proximately caused its injuries; and (ii) Plaintiff did not present any factual allegations that tie mail or wire fraud to its alleged damages.

i.    *Plaintiff Sufficiently Pleads RICO Causation and Injury*

In a claim under Section 1962(c), a RICO plaintiff must allege that a RICO predicate offense "'not only was the 'but for' cause of his injury, but was the proximate cause as well."[68] Proximate causation requires "some direct relation between the injury asserted and the injurious conduct alleged."[69] However, the plaintiff need not be the direct target of the fraud or other racketeering.[70]

Here, Plaintiff alleges an injury to its business or property. United attempts to paint Plaintiff's allegations as "nothing more than a recitation of a history of United's handling of claims";[71] however, under Plaintiff's actual claims, Plaintiff properly alleges that United's misconduct has resulted in thousands of Plaintiff's Covid Testing claims being denied and thousands of others being underpaid despite the requirements of the FFCRA and the CARES Act. These denials and underpayments alone allege an "actual monetary loss" or concrete financial

---

[67] *Id.*; (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).

[68] *Hemi Group, LLC v. City of New York, N.Y.*, 559 U.S. 1, 9 (2010) (citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992)).

[69] *Holmes*, 503 U.S. at 268.

[70] See St. Luke's Health Network, Inc. v. Lancaster General Hospital, No. 19-3340, 2020 WL 4197525, *4-6 (3d Cir. July 22, 2020) (plaintiffs sufficiently alleged proximate cause where defendants allegedly submitted fraudulent statements to a state-run reimbursement program resulting in plaintiffs' receiving an artificially smaller share of funds).

[71] *See* Defendants' Motion to Dismiss Plaintiff's Complaint and Brief in Support [Doc. 67] (Page 14).

*Plaintiff Diagnostic Affiliates of Northeast Hou, LLC d/b/a 24Hour Covid RT-PCR-Laboratory's Response to UHC's Motion to Dismiss*

**27** | P a g e

loss" sufficient to allege a RICO injury.[72] Additionally, as detailed in the Complaint, Plaintiff spent considerable time and resources identifying United's fraudulent conduct and taking action against United. "[C]osts associated with remediating or taking legal action against RICO conduct amount to an 'out-of-pocket loss' that is actionable under RICO."[73] As to causation, Plaintiff has directly and sufficiently linked United's predicate acts to Plaintiff's injuries.

ii.   *Plaintiff Sufficiently Pleads Mail and Wire Fraud*

A mail fraud violation requires proof of two elements: (1) a scheme to defraud, and (2) any "mailing that is incident to an essential part of the scheme … even if the mailing itself contain[s] no false information."[74] Importantly, it is not necessary to allege that the defendant "personally used the mails or wires or even knew of the specific mailings that were made; it is sufficient that a defendant 'causes' the use of the mails or wires."[75] Moreover, mailings "need not be an essential element of the scheme" to defraud, but are sufficient so long as they are "incident to an essential part of the scheme."[76]

The Original Complaint alleges in detail the schemes, programs, and processes utilized by United to defraud Plaintiff, and the use of mails and wires in furtherance of such fraud. Plaintiff went so far as even attaching specific examples of the use mails and wires to further bolster its allegations against United. In any event, United's schemes and fraudulent practices are described clearly and logically, and Plaintiff has pled that United made false statements in furtherance of

---

[72] *Cf. Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d. Cir. 2000).
[73] *Desmond v. Siegel*, No. CIV. 10-5562 DRD, 2012 WL 3228681, at *1 (D.N.J. Aug. 6, 2012) (citing, inter alia, *Weiss v. First Unum Life Ins. Co.*, 482 F.3d 254, 258 n.2 (3d Cir. 2007)).
[74] *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647, 128 S. Ct. 2131, 2138, 170 L. Ed. 2d 1012 (2008) (quoting *Schmuck v. United States*, 489 U.S. 705, 712, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)).
[75] *See Breslin Realty Dev. Corp. v. Schackner*, 397 F. Supp. 2d 390, 399 (E.D.N.Y. 2005)
[76] *Schmuck*, 489 U.S. at 713.

them. As detailed in the Original Complaint, below are examples of fraudulent schemes furthered

by United through the use mails and wires that are the proximate causes of Plaintiff's damages:

- **United's Improper Record Request Scheme and the Imposition of Prohibited Medical Management Requirements**: As pled in the Original Complaint, this was an unlawful scheme that consists of improper, irrelevant, and burdensome medical record requests to Plaintiff for the sole purpose of denying as many claims for bona fide Covid Testing services submitted by Plaintiff as possible. Since the time Plaintiff commenced with submitting Covid Testing claims to United for reimbursement, United almost immediately responded with sending identical pre-payment record request letters to Plaintiff.[77] These letters were sent by the thousands to Plaintiff for no other purpose to harass and unlawfully deny claims for United's financial benefit. United also mailed and electronically issued electronic remittance advices, explanations of benefits, provider remittance advices, and other documents to Plaintiff, its members, to the Employer Plans, and to other self-funded health plans that it administers in furtherance of this Improper Record Request Scheme.

- **United's Meritless Adjudication of Covid Testing Claims**: As pled in the Original Complaint, United unlawfully and inconsistently adjudicated Covid Testing claims regardless of whether the health plan was self-funded or fully-insured and irrespective of the group or product the Covid Testing claim belonged to. United has utilized letters, electronic remittance advices, explanation of benefits, provider remittance advices, and other documents to fraudulently represent to Plaintiff, its members, to the Employer Plans, and other self-funded health plans that it administers that it was adjudicating Covid Testing claims in accordance with applicable laws, that Plaintiff is a network/contracted provider, that Plaintiff had agreed to a negotiated amount, that Covid Testing claims should be adjudicated through a variety of different reimbursement methodologies, and a variety of other misrepresentations.[78]

- **United's CRS Benchmark Program**: This CRS Benchmark Program disincentivizes United to act in the best interests of its health plan members and to defray reasonable expense in the administration of health plans. United is able to manufacture a "savings" and pockets anywhere between 20-35% of that "savings" amount. United has utilized letters, electronic remittance advices, explanation of benefits, provider remittance advices, and other documents to fraudulently to misrepresent to Plaintiff, its members, to the Employer Plans, and other self-funded health plans that it administers that it created a "savings" on behalf of the health plan despite its legal obligations to comply with the FFCRA and the CARES Act so that it could convert for itself anywhere between 20-35% of the difference of the amount that was denied/underpaid and what should have been paid to Plaintiff on behalf of the members of the health plan.

---

[77] *See* Exhibit D and E of the Original Complaint and Jury Demand, Doc. 2 [1-4] [1-5].
[78] *See* Exhibits H, I, J, K, L, M, N, and O of the Original Complaint and Jury Demand, Doc 2 [1-8]-[1-15]; *See* ¶ 184 (Page 71) of the Original Complaint.

These above referenced examples and the supporting documentation included with each of the examples is more than sufficient to allege mail and wire fraud as they were used "to perpetuate an ongoing scheme."[79] The motion to dismiss the RICO claim should be denied.

## VI.   QUANTUM MERUIT / UNJUST ENRICHMENT

The elements of a quantum meruit claim are: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) those services and materials were accepted by the person sought to be charged, and were used and enjoyed by him; and (4) the person sought to be charged was reasonably notified that the plaintiff performing such services or furnishing such materials was expecting to be paid by the person sought to be charged.[80]  United's arguments with respect to Plaintiff's quantum meruit and unjust enrichment claims are as follows: (i) Plaintiff did not render services for the benefit of United; and (ii) the existence of the written plans/insurance contracts between United and its members preclude a quantum meruit claim.

As it relates to United's the first argument, the Court in *El Paso Healthcare Sys., Ltd. V. Molina Healthcare of N.M., Inc.*, specifically states:

> While it is true that the immediate beneficiaries of the medical services were the patients, and not [the payor], [payor] *did* receive the benefit of having its obligations to its plan members . . . discharged. . . . Indeed, [payor's] very reason for existence is to ensure that such services are provided to plan members; seeing this core obligation fulfilled is hardly incidental.[81]

Multiple other courts have reached the same conclusion.[82]

---

[79] *United States v. Surtain*, 519 F. App'x 266, 285 (5th Cir. 2013) (holding that a letter mailed by an insurer informing the defendant-insured that their policy was defective was sufficient to sustain a mail fraud claim against the defendant because a "would-be insurance scammer must expect that as a normal part of the claims process—or, stated differently, as a 'step in [the] plot'—he will be required to prove his claim's legitimacy").

[80] *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 732 (Tex. 2018)

[81] *El Paso Healthcare Sys., Ltd. V. Molina Healthcare of N.M., Inc.*, 683 F. Supp. 2d 454, 461 (W.D. Tex. 2010).

[82] *See*, e.g., *Baptist Hosp. of Miami, Inc. v. Medica Healthcare Plans, Inc.*, 385 F. Supp. 3d 1289, 1293 (S.D. Fla. 2019); *Nat'l Labs., LLC v. United Healthcare Grp., Inc.*, 2018 U.S. Dist. LEXIS 58328, at *14-15 (S.D. Fla. Apr. 3, 2018); *Appalachian Reg'l Healthcare v. Coventry Health & Life Ins. Co.*, 2013 WL 1314154, at *3-4 (E.D. Ky. Mar. 28, 2013).

In making this argument, United relies upon the Court's decision in *ACS Primary Care Physicians Sw., P.A. v. UnitedHealthcare Ins. Co.*, where it concludes that a "provider cannot state a claim for quantum meruit against health plan because services were provided to plan members, not the plan administrator or insurer."[83] However, this Court does acknowledge that "that there is conflicting case law as to whether the indirect benefit that an insurer or health plan receives from a plan member's receipt of medical services is enough to support a quantum meruit claim."[84] The Third Circuit recently confirmed that "where a healthcare provider claims unjust enrichment against an insurer, the benefit conferred, if any, is not the provision of the healthcare service *per se*, but rather the discharge of the obligation the insurer owes to the insured."[85] As it relates to United's first argument, this Court has the discretion to align itself with the Western District of Texas and the Third Circuit.

For its second argument, United relies upon: (i) *Pepi Corp v. Galliford* (observing no claim for quantum meruit may lie where there is an existing contract covering the subject matter);[86] and (ii) *ACS Primary Care* (express contract bar precluded quantum meruit claim because "healthcare plans are express contracts between the Defendants and their insured which bear directly on Plaintiff's claims").[87] A critical differentiating factor from the aforementioned cases is that United's legal obligation in this case does arise from the FFCRA and the CARES and <u>not</u> from any benefit plan or insurance contact. Pursuant to federal law, United is legally required to pay for Covid Testing services for members of its health plans, and United <u>must</u> pay pursuant to the rate methodology set by Congress – the plan language regarding OON coverage and reimburse is

---

[83] *ACS Primary Care Physicians Sw., P.A. v. UnitedHealthcare Ins. Co.*, 514 F. Supp. 3d 927, 935.
[84] *Id*. at 934.
[85] *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 240 (3d Cir. 2020).
[86] *Pepi Corp. v. Galliford*, 254 S.W.3d 457, 460 (Tex. App.—Houston [1st Dist.] 2007, pet. denied)
[87] *ACS Primary Care*, 514 F. Supp. 3d. at 935.

irrelevant. There is no existing contract between insurer and insured that covers the subject matter of Covid Testing as required under *Pepi Corp*.

Ultimately, despite its requirement to comply with the FFCRA and the CARES Act as it relates to Covid Testing services – and not any health plan or insurance contact – United unjustly enriched itself by failing to provide the statutorily required reimbursement and maintaining the funds for its own benefit. The motion to dismiss the quantum meruit and unjust enrichment claims should be denied.

## VII.   PLAINTIFF HAS SUFFICIENTLY PLED ITS PROMISSORY ESTOPPEL CLAIM

The elements of Promissory Estoppel are: (1) a promise; (2) foreseeability of reliance thereon by the promisor; (3) substantive reliance by the promise to his detriment.[88] United's arguments with respect to Plaintiff's promissory estoppel claim is as follows – none of Plaintiff's allegations show that United made a sufficiently specific and definite promise to Plaintiff that it would pay Covid Testing claims such that Plaintiff's purported reliance on any statements would be reasonable.

In the Original Complaint, Plaintiff also makes reference to Plaintiff's communications with United agents, and, as part of those communications, the United agents made representations regarding its compliance with the FFCRA and the CARES Act and/or how United adjudicated Covid Testing claims.[89] Plaintiff took many actions based upon United's publicized statements and the United agents' representations about the FFCRA, the CARES Act, the adjudication of Covid Testing claims, and United's publicized statements. However, despite every action taken in

---

[88] *Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 378-79 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *English v. Fischer*, 660 S.W.2d 521, 524 (Tex. 1983)).
[89] *See* Original Complaint and Jury Demand [Doc. 2], ¶¶ 122, 185-187 (page 47 and 71).

reliance upon the representations made to Plaintiff in these statements and communications, United continued to improperly adjudicate Covid Testing claims.

In *Mid-Town Surgical Center, L.L.P. v. Humana Health Plan of Texas, Inc.*, the Court determined that Humana could not at the Motion to Dismiss state request for additional detail as to the content of the statements or communications made by Humana representatives because Humana "asks for more than what [Mid-Town Surgical Center] must plead under rule 8"[90] and such requests would be better addressed on a motion for summary judgment.[91] Numerous courts confronted with similar allegations have found a complaint adequate to state a claim for promissory estoppel.[92] The motion to dismiss this promissory estoppel claim should be denied as Plaintiff has sufficiently pled a claim for relief that is plausible on its face.

## VIII.   ENTITLED TO STATE PENALTIES UNDER THE TPPA

United argues that Plaintiff's TPPA claim should be dismissed because Plaintiff's Covid Testing services do not constitute care related to an emergency and that penalties under the TPPA are not available to OON providers. As detailed above, the passing of FFCRA and CARES Act during in the midst of a public health disaster that mandates the coverage and reimbursement of Covid Testing services qualifies Covid Testing as an emergency service.

Additionally, section 843.351 of the Texas Insurance Code requires prompt payment of claims when a non-network provider renders medical care related to an emergency or its attendant

---

[90] See FED. R. CIV. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"); see also *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (requiring "only enough facts to state a claim to relief that is plausible on its face").
[91] *Mid-Town Surgical Ctr., L.L.P. v. Humana Health Plan of Texas, Inc.*, 16 F. Supp. 3d 767, 782 (S.D. Tex. 2014).
[92] See, e.g., *Grand Parkway Surgery Ctr., LLC v. Health Care Serv. Corp.*, No. CIV.A. H-15-0297, 2015 WL 3756492, at *6 (S.D. Tex. June 16, 2015); *Texas Gen. Hosp., LP v. United Healthcare Servs., Inc.*, No. 3:15-CV-02096-M, 2016 WL 3541828, at *12 (N.D. Tex. June 28, 2016); *Broad St. Surgical Ctr., LLC v. UnitedHealth Grp., Inc.*, No. CIV. 11-2775 JBS/JS, 2012 WL 762498, at *9 (D.N.J. Mar. 6, 2012).

episode of care as required by state or federal law.[93] Texas Courts have ruled against applying TPPA statutory penalties to OON providers because penalty structure depends, for its calculation, on the contracted right of reimbursement to the provider.[94] However, this matter is distinguishable as Section 3202(a) of the CARES Act specifically requires all Texas licensed insurers offering insurance products that are subject to Section 6001 of the FFCRA to either pay OON providers a negotiated amount or their cash price. The CARES Act sets forth a methodology that is not subject or open to interpretation like "usual, customary, and reasonable" (or "UCR") rates. Since United did not even attempt to negotiate an amount to be paid for Covid Testing claims despite Plaintiff's efforts, statutory penalties for United's violation of the TPPA for failing to comply with the FFCRA and the CARES Act can be calculated from Plaintiff's cash price that are publicized on its website.

## IX.   DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF ARE PROPER

Plaintiffs' underlying causes of action are sufficiently pled to sustain a claim for declaratory relief, as described above, and such action is appropriate. Here, in addition to seeking damages to related to United's denials and underpayments of Covid Testing claims, Plaintiff is also seeking relief from for United's failure to provide a full and fair review and for its racketeering activities. Claims seeking more than just money damages indicate that the relief sought is more likely to be equitable relief.[95] Clearly these causes of action request more than just money damages and as such, Plaintiffs are entitled to equitable relief.[96] Thus, Plaintiff's claims for equitable relief,

---

[93] *Texas Med. Res., LLP v. Molina Healthcare of Texas, Inc*., 620 S.W.3d 458, 469 (Tex. App. 2021).
[94] *Id.*
[95] *Cent. States, Southeast & Southwest Areas Health & Welfare Fund v. Health Special Risk, Inc*., 756 F.3d 356, 360 (5th Cir. 2014).
[96] *Id.*

based on the viable claim described above and throughout the entirety of the Original Complaint,

should not be released.

## X.     UNITEDHEALTH GROUP INCORPOATED IS AN APPOPRIATE DEFENDANT[97]

In UHG's Motion to Dismiss, UHG presents two reasons as to why it should be dismissed

from this action:

1.  The Complaint does not contain sufficient allegations to sufficiently demonstrate that the Court has jurisdiction over UHG, and the United Entities' contacts may not be imputed to UHG for jurisdictional purposes.

2.  Moreover, the factual allegations pleaded relate to the conduct of UHG's subsidiaries and affiliates and are insufficient to state a viable claim against UHG because a parent corporation cannot be liable for the purported wrongdoing of its subsidiaries.

### A.     Legal Standard for Rule 12(b)(2) Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(2) governs challenges to personal jurisdiction.[98]

Personal jurisdiction is proper under the Due Process Clause only if (1) the nonresident "has

established minimum contacts with the forum," i.e., the state of Texas, and (2) "the exercise of

jurisdiction comports with 'traditional notions of fair play and substantial justice.'"[99] The Supreme

Court of Texas has said that the long-arm statute's broad doing-business language allows the statute

to "reach as far as the federal constitutional requirements of due process will allow."[100] Thus, the

---

[97] For purposes of this Section X of the Response, United HealthCare Services, Inc. ("UHCS"), UnitedHealthcare Benefits of Texas, Inc. ("UHB of Texas"), UnitedHealthcare of Texas, Inc. ("UHC of Texas"), UMR, Inc. ("UMR"), and OptumHealth Care Solutions, LLC ("Optum") shall collectively be referred to as the "United Entities".

[98] *Weisskopf v. United Jewish Appeal-Fed'n of Jewish Philanthropies of New York, Inc.*, 889 F. Supp. 2d 912, 919 (S.D. Tex. 2012).

[99] *Id.* (quoting *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d at 575 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

[100] *Moki Mac* at 575 (Tex. 2007) (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex.1991); *see also Schlobohm*, 784 S.W.2d at 357; U–Anchor Adver., Inc. v. Burt, 553 S.W.2d 760, 762 (Tex.1977).

requirements of the Texas long-arm statute are satisfied if an assertion of jurisdiction accords with federal due-process limitations.[101]

Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant "'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'"[102] The Supreme Court of Texas explains that there are three parts to a "purposeful availment" inquiry:

1. only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person;

2. the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated; and

3. the defendant seeks some benefit, advantage, or profit by availing itself of the jurisdiction.[103]

A nonresident defendant's forum-state contacts may give rise to two types of personal jurisdiction: (i) general jurisdiction, and (ii) specific jurisdiction. If a defendant makes continuous and systematic contacts with the forum, general jurisdiction is established whether or not the defendant's alleged liability from those contacts.[104] In contrast, when specific jurisdiction is alleged, we focus the minimum-contacts analysis on the "relationship among the defendant, the forum [,] and the litigation."[105] Specific jurisdiction is established if the defendant's alleged liability "aris[es] out of or [is] related to" an activity conducted within the forum.[106]

---

[101] *Weisskopf* at 919 (citing *Am. Type Culture Collection, 83 S.W.3d at 806; CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex.1996)); *Schlobohm*, 784 S.W.2d at 357.
[102] *Id*. (citing *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (quoting *Int'l Shoe Co.,* 326 U.S. at 319, 66 S.Ct. 154); *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex.2005).
[103] *Id.*
[104] *Id*.
[105] *Guardian Royal*, 815 S.W.2d at 228 (citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Schlobohm*, 784 S.W.2d at 357).
[106] *Helicopteros*, 466 U.S. at 414 n. 8, 104 S.Ct. 1868; *see also CSR Ltd.*, 925 S.W.2d at 595.

### B.      Plaintiff has Sufficiently Pled Personal Jurisdiction Against UHG

Throughout the entirety of the Complaint, Plaintiff has clearly alleged that UHG and the United Entities' have acted in concert the perpetuate its unlawful activity and fraudulent schemes within the State of Texas. Plaintiff has sufficiently pled that: (i) UHG's contact with its United Entities operating in Texas are relevant to the allegations detailed in the Original Complaint; (ii) UHG's contacts with the United Entities were purposeful in order to perpetuate in unlawful activity and fraudulent schemes; and (iii) UHG gained a number of benefits, advantages, and profits through its execution of its unlawful activity and fraudulent schemes. Therefore, both general and specific jurisdiction against UHG have been established by Plaintiff.

### C.      Plaintiff has Sufficiently Pled UHG's Involvement In and Control Over Fraudulent Activity

Courts will apply the alter ego doctrine and hold parent liable for the actions of its instrumentality in the name of equity when the corporate form is used as a "sham to perpetuate a fraud."[107] The alter ego doctrine, like all variations of piercing the corporate veil doctrine, is reserved for exceptional cases.[108] The doctrine applies only if "(1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil."[109] Only "constructive fraud" is required, meaning "the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests."[110] "[N]either fraud nor an intent to defraud need be

---

[107] *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) (quoting *Pan Eastern Exploration Co. v. Hufo Oils*, 855 F.2d 1106, 1132 (5th Cir.1988)).
[108] In re Multiponics, Inc., 622 F.2d 709, 724–25 (5th Cir.1980).
[109] Bridas I, 345 F.3d at 359.
[110] *Ledford v. Keen*, 9 F.4th 335, 339 (5th Cir. 2021) (citing *Spring Street Partners*, 730 F.3d at 443 (quoting *Castleberry*, 721 S.W.2d at 273)).

shown," but only that "recognizing the separate corporate existence would bring about an inequitable result."[111]

Contrary to UHG's argument, the Original Complaint contains allegations sufficient to support UHG's inclusion as a defendant in this matter. By way of example, Plaintiff alleges that UHG owns and controls the United Entities named as defendants in this action, and alleges that all unlawful/racketeering activity detailed throughout the entirety of Plaintiff's Original Complaint were perpetrated hand-in-hand by "United", which is defined to include both UHG and the United Entities. Constructive fraud has been sufficiently pled as throughout the entirety of Original Complaint, Plaintiff has alleged, in specific detail, the breach of some legal or equitable duty that the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests. Nowhere in the Original Complaint does Plaintiff allege that UHG is liable for its subsidiaries' actions. Instead, the Original Complaint alleges systematic and unlawful/racketeering activities across Defendants UHG and United Entities, which prevented Plaintiff from receiving full and proper payment for the Covid Testing services provided and, ultimately, damaging Plaintiff. Since Plaintiff does not base its claim against UHG merely on its ownership of the United Entities, but rather on alleged fraudulent conduct by UHG in concert with the United Entities, UHG's motion to dismiss should be denied.

## XI.    ANY DISMISSAL SHOULD BE WITHOUT PREJUDICE

Plaintiff has sufficiently met its burden, at this early stage of litigation, to state a claim with respect to every cause of action it has plead in the Original Complaint and to show that it is entitled

---

[111] *Ledford* at 339 (quoting *Castleberry*, 721 S.W.2d at 272–73).

*Plaintiff Diagnostic Affiliates of Northeast Hou, LLC d/b/a 24Hour Covid RT-PCR-Laboratory's*
*Response to UHC's Motion to Dismiss*
**38** | P a g e

to enforce the rights involved. Nonetheless, if the Court decides to dismiss any cause of action, Plaintiff respectfully moves for leave to amend the Complaint.[112]

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny United, the Employer Plans, and UHG's Motions to Dismiss.

Dated: October 29, 2021

Respectfully Submitted,

By: /s/ Ebad Khan
Ebadullah (Ebad) Khan
Federal Bar No. 2810999
State Bar No. 24092625
ekhan@24hourcovid.com
23330 US-59, Suite 300
Kingwood, Texas 77339
(281) 319.8306 Direct
(281) 605.6690 Facsimile
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of October, 2021, the above and foregoing *Plaintiff's Diagnostic Affiliates of Northeast Houston, LLC d/b/a 24Hour Covid RT-PCR- Laboratory's Response to UHC's Motion to Dismiss* was electronically filed with the Clerk of the Court using the CM/ECF system, which sent notice of electronic filing to all counsel of record.

/s/ Ebad Khan
ATTORNEY FOR PLAINTIFF

---

[112] *See Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) (our cases support the premise that "[g]ranting leave to amend is especially appropriate ... when the trial court has dismissed the complaint for failure to state a claim [,]" *Griggs v. Hinds Junior College*, 563 F.2d 179, 180 (5th Cir.1977) (per curiam) (addressing Rule 12(b)(6) dismissal)).

*Plaintiff Diagnostic Affiliates of Northeast Hou, LLC d/b/a 24Hour Covid RT-PCR-Laboratory's*
*Response to UHC's Motion to Dismiss*
**39** | P a g e