IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| DIAGNOSTIC AFFILIATES OF NORTHEAST HOU, LLC d/b/a 24HOUR COVIDRT-PCR LABORATORY       *Plaintiff,*  v.  UNITED HEALTH GROUP, INC., et al.       *Defendants.* | § § § § § § § § § § § § § | C.A. No. 2:21-cv-00131 |

### DEFENDANTS' REPLY IN SUPPORT OF
### MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendants United HealthCare Services, Inc., UnitedHealthcare Benefits of Texas, Inc., UnitedHealthcare of Texas, Inc., UMR, Inc., OptumHealth Care Solutions, LLC (collectively, "United") and the Defendant employer-sponsored health benefit plans identified on Exhibit A attached hereto[1] and incorporated herein (collectively, the "Employer Plans" and, together with United, "Defendants"), file this Reply in support of their Motion to Dismiss the Complaint [Doc. 67] (hereinafter, the "Motion"), and state:

### I. SUMMARY OF THE RESPONSE

Plaintiff's Response [Doc. 99]—while full of hyperbolic accusations of wrongdoing by Defendants—neglects to do one thing: put forth *any* argument or cite *any* authority that demonstrates its Complaint [Doc. 2] states a viable claim for relief. Instead, Plaintiff contends that

---

[1] Exhibit A to this reply has been revised to include the Delta Health Based Account Plan and H&E Equipment Services Inc. benefit plan, which filed their own motions to dismiss joining in and incorporating the Defendants' pending Motion on November 16, 2021 [Doc. 112], and November 19, 2022 [Doc. 119], respectively.

the Families First Coronavirus Response Act ("FFCRA")[2] and the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act")[3] were passed for the benefit of COVID testing providers (rather than patients) and that in this unprecedented situation the Court *must* ignore the well-established canons of statutory interpretation and create a private cause of action where none exists. [Resp. at 13.] Plaintiff—a COVID-testing provider who posted a cash price of **$900.00** per test[4] on its website—asks the Court to sanction its scheme to exploit a national crisis for its own pecuniary benefit by permitting its baseless claims to proceed.[5] [Compl. at 43.]

But Federal Rule of Civil Procedure 12(b)(6) empowers the Court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Even when a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2007). The Court must evaluate "whether the plaintiff has stated a legally cognizable claim that is plausible." *Body By Cook, Inc. v. State Farm Mut. Auto Ins.*, 869 F.3d 381, 385 (5th Cir. 2017) (quoting *Doe ex rel. Magee v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 854 (5th Cir. 2012). Plaintiff's ire at Defendants' unwillingness to pay its exorbitant rates is insufficient to entitle it to relief on any of the causes of action or theories alleged, particularly in

---

[2] Pub. L. No. 116-127, 134 Stat. 178.

[3] Pub. L. No. 116-136, 134 Stat. 281.

[4] Notably, the Center for Medicaid and Medicare Services ("CMS") established a reimbursement rate of $75 per test making the "cash price . . . listed by [Plaintiff] on a public internet website" **_twelve times higher_** than the CMS rate. The Court may take judicial notice of the CMS rates without converting the Motion into one for summary judgment. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Funk v. Stryker Corp.*, 631 F.3d 777, 782 (5th Cir. 2011) (incorporation of matters in the public record did not convert motion to summary judgment when no facts were in dispute).

[5] Sarah Kliff, *This Lab Charges $380 for a Covid Test. Is That What Congress Had in Mind?*, N.Y. Times, Sep. 26, 2021, https://www.nytimes.com/2021/09/26/upshot/cost-of-covid-rapid-test-prices.html?. "Pursuant to [Federal Rule of Evidence] 201(b), Courts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles." *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006).

light of Plaintiff's continued refusal to provide information needed to evaluate and verify its claim submissions and lab credentials, as well as Plaintiff's admitted failure to follow the procedures established for appealing claim denials. Accordingly, the Complaint should be dismissed.

## II.  ARGUMENT & AUTHORITIES

### A.  THERE IS NO EVIDENCE THAT CONGRESS INTENDED TO CREATE A PRIVATE RIGHT OF ACTION FOR COVID TESTING PROVIDERS.

Plaintiff fails to meet the "relatively heavy burden of demonstrating that Congress affirmatively contemplated private enforcement when it passed" the FFCRA and the CARES Act. *Casas v. Am. Airlines, Inc.*, 304 F.3d 517, 521 (5th Cir. 2002). Plaintiff cites no evidence and no authority showing that Congress intended to create a private right of action enabling COVID testing providers to enforce the provisions of the FFCRA or the CARES Act against health insurance issuers and group health plans, which is the "touchstone" or "crucial inquiry" of the four-part analysis in *Cort v. Ash*.[6] *Id.* at 521-22. The fact that COVID testing providers may incidentally benefit from the provisions of the FFCRA and the CARES Act, standing alone, does not demonstrate otherwise. *See Juan Antonio Sanchez, PC v. Bank of S. Tex.*, 494 F. Supp. 3d 421, 433 (S.D. Tex. 2020) (courts must "interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy").

The provision on which Plaintiff relies, Section 6001(a) of the FFCRA, must be read in context. *Juan Antonio Sanchez, PC*, 494 F. Supp. 3d at 433 (statutory language must be contextualized). Section 6001, "Coverage of Testing for COVID-19," states in its entirety:

> (a) IN GENERAL.—***A group health plan and a health insurance issuer*** offering group or individual health insurance coverage (including a grandfathered health plan (as defined in section 1251(e) of the Patient Protection and Affordable Care Act)) shall provide coverage, and ***shall not impose any cost sharing (including deductibles, copayments, and coinsurance) requirements or prior authorization***

---

[6] 422 U.S. 66, 78 (1975).

*or other medical management requirements*, for the following items and services furnished during any portion of the emergency period defined in paragraph (1)(B) of section 1135(g) of the Social Security Act (42 U.S.C. 1320b–5(g)) beginning on or after the date of the enactment of this Act:

> (1) In vitro diagnostic products (as defined in section 809.3(a) of title 21, Code of Federal Regulations) for the detection of SARS–CoV–2 or the diagnosis of the virus that causes COVID–19 that are approved, cleared, or authorized under section 510(k), 513, 515 or 564 of the Federal Food, Drug, and Cosmetic Act, and the administration of such in vitro diagnostic products.
>
> (2) Items and services furnished to an individual during health care provider office visits (which term in this paragraph includes in-person visits and telehealth visits), urgent care center visits, and emergency room visits that result in an order for or administration of an in vitro diagnostic product described in paragraph (1), but only to the extent such items and services relate to the furnishing or administration of such product or to the evaluation of such individual for purposes of determining the need of such individual for such product.

(b) ENFORCEMENT.—The *provisions of subsection (a) shall be applied by the Secretary of Health and Human Services, Secretary of Labor, and Secretary of the Treasury* to group health plans and health insurance issuers offering group or individual health insurance coverage as if included in the provisions of part A of title XXVII of the Public Health Service Act, part 7 of the Employee Retirement Income Security Act of 1974, and subchapter B of chapter 100 of the Internal Revenue Code of 1986, as applicable.

(c) IMPLEMENTATION.—*The Secretary of Health and Human Services, Secretary of Labor, and Secretary of the Treasury may implement the provisions of this section* through sub-regulatory guidance, program instruction or otherwise.

(d) TERMS.—The terms "group health plan"; "health insurance issuer"; "group health insurance coverage", and "individual health insurance coverage" have the meanings given such terms in section 2791 of the Public Health Service Act (42 U.S.C. 300gg–91), section 733 of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1191b), and section 9832 of the Internal Revenue Code of 1986, as applicable.

Pub. L. No. 116-127, 134 Stat. 178 (emphasis added). Section 3202 of the CARES Act adds:

> (a) REIMBURSEMENT RATES.—A group health plan or a health insurance issuer providing coverage of items and services described in section 6001(a) of division F of the Families First Coronavirus Response Act (Public Law 116–127) with respect to an enrollee shall reimburse the provider of the diagnostic testing as follows:
>
> > (1) If the health plan or issuer has a negotiated rate with such provider in effect before the public health emergency declared under section 319 of the

> Public Health Service Act (42 U.S.C. 247d), such negotiated rate shall apply throughout the period of such declaration.
>
> (2) If the health plan or issuer does not have a negotiated rate with such provider, such plan or issuer shall reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website, or such plan or issuer may negotiate a rate with such provider for less than such cash price.
>
> (b) REQUIREMENT TO PUBLICIZE CASH PRICE FOR DIAGNOSTIC TESTING FOR COVID–19.—
>
> (1) IN GENERAL.—During the emergency period declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), each provider of a diagnostic test for COVID–19 shall make public the cash price for such test on a public internet website of such provider.
>
> (2) CIVIL MONETARY PENALTIES.—*The Secretary of Health and Human Services may impose a civil monetary penalty* on any provider of a diagnostic test for COVID–19 that is not in compliance with paragraph (1) and has not completed a corrective action plan to comply with the requirements of such paragraph, in an amount not to exceed $300 per day that the violation is ongoing.

Pub. L. No. 116-136, 134 Stat. 281.

Section 6001(a) focuses on the entities being regulated: health insurance issuers and group health plans. *Juan Antonio Sanchez, PC*, 494 F. Supp. 3d at 433 (statutes directed at "the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of person") (quoting *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001)); *see also Delancey v. City of Austin*, 570 F.3d 590, 594 (5th Cir. 2009) (statute that focuses on person regulated and "prescribes a policy and practice" directed at the head of an agency does not imply a private right of action). Section 6001(b) then empowers the Secretary of Health and Human Services, Secretary of Labor, and Secretary of Treasury—not a private person or entity—to apply the requirements of Section 6001(a). *See California v. Sierra Club*, 451 U.S. 287, 297-98 (1981) (statute that was intended to benefit the public at large through a general regulatory scheme administered by federal agency did not create federal rights to benefit a particular class of persons).

If Congress intended to provide a private right and private remedy to enforce the provisions of the FFCRA and the CARES Act, it would have expressly done so, as it did in Sections 3102, 5102, and 5105 of the FFCRA—each of which incorporate the private enforcement provisions of the Fair Labor Standards Act and the Family Medical Leave Act. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979) ("Obviously, then, when Congress wished to provide a private damage remedy, it knew how to do so and did so expressly."); *Tex. Health & Human Servs. Comm'n v. United States*, 193 F. Supp. 3d 733, 740 (N.D. Tex. 2016) ("And where Congress creates a comprehensive statutory scheme with express provision for private enforcement in certain circumstances, 'it is highly improbable that Congress absentmindedly forgot to mention an intended private action.'") (quoting *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 20 (1979)). Taken together, Congress did *not* intend to create a private right or a private remedy for COVID testing providers. *Tex. Voters All. v. Dallas Cnty.*, 495 F. Supp. 3d 441, 460 (E.D. Tex. 2020) ("It is canonical that 'Congress's creation of specific means of enforcing [a] statute indicates that it did *not* intend to allow an additional remedy—a private right of action—that it did not expressly mention at all.'") (quoting *Stokes v. Sw. Airlines*, 887 F.3d 199, 203 (5th Cir. 2018)).

Further, nothing in the FFCRA or the CARES Act abrogates the principle that healthcare providers' services are rendered to and for their patients, not insurers or group health plans. *See, e.g.*, *ACS Primary Care Physicians Sw., P.A. v. UnitedHealthcare Ins. Co.*, 514 F. Supp. 3d 927, 935 (S.D. Tex. 2021). Insurers and group health plans routinely pay out-of-network providers for healthcare services provided to their enrollees under the terms of the particular enrollee's policy or plan. *See, e.g.*, *N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, 781 F.3d 182, 194 (5th Cir. 2015) (plan enrollees "contracted for coverage at out-of-network providers under

their insurance plans"). The FFCRA and the CARES Act require health insurance issuers and group health plans to provide *coverage* for COVID diagnostic testing without requiring their enrollees to pay any cost-sharing or enforcing the "medical management requirements" that would ordinarily apply under the terms of the relevant plan or policy and lays out a method for determining the rates of payment for both in-network and out-of-network providers. *See N. Cypress*, 781 F.3d at 187 (plan's higher cost-sharing for services by out-of-network providers ensures that in-network providers are less costly to patients). To the extent that any class of persons is the intended beneficiary of Section 6001 of the FFCRA, it is individuals who are covered by a plan or policy from a health insurance issuer or a group health plan. The Court is "bound to follow Congress's choices in this arena, and bound to ascertain those choices through the tools of statutory interpretation." *Stokes*, 887 F.3d at 201. For all of these reasons, Count I of the Complaint should be dismissed.

### B. PLAINTIFF HAS NOT SHOWN IT HAS STANDING UNDER ERISA.

It is undisputed that "a healthcare provider, though not a statutorily designated ERISA beneficiary, may obtain standing to sue derivatively to enforce an ERISA plan beneficiary's claim." *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Emp. Health Care Plan*, 426 F.3d 330, 333 (5th Cir 2005). To obtain such standing, a provider *must* plead both factual allegations showing that the provider's patients assigned their rights to the provider *and* that the provider exhausted its administrative remedies before filing suit. *Moss v. Unum Grp.*, 638 F. App'x 347, 349 (5th Cir. 2016). Plaintiff does neither.

Instead, Plaintiff simply pleads that "[m]any of the members of plans . . . executed assignment of benefits documents" [Compl. ¶ 201] and that, "[b]ecause it is fundamentally impossible to predict how a particular Covid Testing claim may be adjudicated on initial submission, appeal, or otherwise [Compl. ¶ 146]," Plaintiff should be excused from these statutory

requirements [Compl. ¶¶ 204-08]. Indeed, rather than respond to or address these deficiencies in its Complaint, Plaintiff broadly urges the Court to conclude that, "under the unique circumstances of this case" [Resp. at 19], "these emergency laws passed in the midst of a public health emergency have special exception and confer standing to Plaintiff . . . to pursue this remedy under ERISA" [Resp. at 22]. Plaintiff's arguments are unavailing for several reasons.

First, by admitting that it did not appeal all of its claims, Plaintiff cannot show that there was a "*certainty* of an adverse decision" on appeal. *N. Cypress Med. Ctr. Operating Co., Ltd. v. Cigna Healthcare*, No. 4:09-CV-2556, 2016 WL 9330500, at *3 (S.D. Tex. Sept. 28, 2016) (emphasis original); *see Battles v. Dearborn Nat'l Life Ins. Co.*, No. 1:19-CV-00078-LY-ML, 2020 WL 6379332, at *6 (W.D. Tex. Aug. 20, 2020), *report and recommendation adopted*, No. 1:19-CV-78-LY, 2020 WL 6379509 (W.D. Tex. Sept. 11, 2020) (showing of potential bias in initial claim determination is not evidence of futility of appeal; to conclude otherwise "would provide an avenue for every claimant to assert the affirmative defense of futility by directing the court to the initial decision maker's adverse decision"); *Fustok v. UnitedHealth Grp., Inc.*, No. 12-CV-787, 2012 WL 12937486, at *5 (S.D. Tex. Sept. 6, 2012) (healthcare claims are submitted and evaluated individually).

Second, Plaintiff, even as an assignee, is not entitled to rely on a deemed exhaustion argument based on an alleged failure to furnish information to a plan participant or beneficiary. *See, e.g.*, *Mem'l Hermann Health Sys. v. Sw. LTC, Ltd.*, No. 4:14-CV-02572, 2016 WL 3526137, at *8 (S.D. Tex. June 7, 2016), *adopted*, No. 4:14-CV-2572, 2016 WL 3552281 (S.D. Tex. June 23, 2016), *aff'd*, 683 Fed. App'x 274 (5th Cir. 2017) (plan administrator is not required to furnish provider who failed to provide proof of its status as an assignee with copies of plan documents).

More importantly, that Section 6001 of the FFCRA can be applied by federal agencies as if it were included in Part 7 of ERISA does *not*—expressly or implicitly—alter *any* provisions of ERISA, including the prerequisites to bring a lawsuit seeking payment of benefits. *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 112 (2014) ("Analysis of the statutory text, aided by established principles of interpretation, controls."). Accordingly—and at a minimum—Plaintiff's claims for benefits under ERISA plans for which Plaintiff did not obtain an assignment of benefits and/or did not exhaust its administrative remedies prior to filing suit must be dismissed. Similarly, Plaintiff has not identified any support for its contention that its claim for equitable relief under Section 502(a)(3) "should not be disregarded despite [its] ERISA 502(a)(1)(B) claim" [Resp. at 25-26] even in the face of controlling authority to the contrary. *See, e.g.*, *Manuel v. Turner Indus. Grp., L.L.C.*, 905 F.3d 859, 867 (5th Cir. 2018); *Tolson v. Avondale Indus., Inc.*, 141 F.3d 604, 610 (5th Cir. 1998). As a result, Plaintiff's Section 503 claim should also be dismissed.

### C. PLAINTIFF HAS NOT STATED A VIABLE RICO CLAIM.

Defendants moved to dismiss Plaintiff's RICO claim on two grounds: (1) that Plaintiff's allegations "are really nothing more than a recitation of United's handling of claims that Plaintiff contends should have been, but were not paid" and (2) because Plaintiff "cannot plausibly allege that the RICO violation proximately caused its injuries." [Mot. at 14 (internal quotation marks omitted).] A plaintiff has standing to bring a RICO claim only if "he has been injured in his business or property *by reason of* the conduct constituting the violation." *Allstate Ins. Co. v. Benhamou*, 190 F. Supp. 3d 631, 644 (S.D. Tex. 2016) (emphasis original). "To establish that an injury came about 'by reason of' a RICO violation, a plaintiff must show that a predicate offense 'not only was a 'but for' cause of his injury, but a proximate cause as well." *Id*. (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).

All of the actions about which Plaintiff complains—the "Improper Record Request Scheme and Imposition of Prohibited Medical Management Requirements," "Meritless Adjudication of Covid Testing Claims," and "United's CRS Benchmark Program" [Resp. at 29]—are not the actual or proximate *cause* of its alleged injury, which is, quite simply, the denial of claims for which it seeks payment of benefits. Regardless of what United allegedly did or did not represent to Plaintiff or plan members about the denial of Plaintiff's claims, Plaintiff's claimed injury is the same—it was not paid. *See, e.g.*, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) (competitor's alleged defrauding of state tax authority that allowed it to offer lower prices was not the proximate cause of plaintiff's lost sales for purposes of RICO claim). This is not a cognizable RICO injury, and nothing in the Complaint or the Response shows otherwise. As a result, Plaintiff's RICO claim should be dismissed.

### D. THE ONLY OBLIGATION DEFENDANTS HAVE TO PAY FOR COVID-DIAGNOSTIC TESTING PROVIDED TO THEIR MEMBERS/ENROLLEES IS PURSUANT TO THE UNDERLYING PLAN OR POLICY.

In an imaginative attempt to avoid the inevitable result under well-established precedent that Plaintiff's claims for quantum meruit and unjust enrichment fail because Plaintiff did not provide COVID diagnostic testing services for the benefit of Defendants, Plaintiff contends that its claims for quantum meruit and unjust enrichment are not based on the individual policies or plans in which its patients are enrolled, but on a separate obligation under the FFCRA and CARES Act. [Resp. at 31.] This argument, however, is unavailing.

As explained above, Section 6001(a) of the FFCRA requires group health plans and health insurance issuers to provide *coverage* for COVID diagnostic testing without imposing any cost-sharing or medical management requirements *on its enrollees*. The CARES Act expands those requirements to a broader range of diagnostic services and sets forth a method for determining the amount that testing providers are to be reimbursed. But *neither* the FFCRA nor the CARES Act

create an independent obligation for health insurance issuers and group health plans to pay COVID testing providers. Rather, they supplant or supplement the terms of any plan or policy that would otherwise lead to a denial of *coverage* for COVID diagnostic testing or require the *enrollee* to contribute any amount toward payment. Texas law is clear that, "[w]here, as here, a plaintiff renders services to an insured, courts applying Texas law have held the plaintiff does not have a quantum meruit claim against the insurer because any services rendered only indirectly benefit the insurer, if they benefit the insurer at all." *Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 620 S.W.3d 458, 470 (Tex. App.—Dallas 2021, pet. filed). Thus, Plaintiff's quantum meruit and unjust enrichment claim should be dismissed.

E. **THE FACTUAL ALLEGATIONS IN THE COMPLAINT, EVEN IF TAKEN AS TRUE, FAIL TO STATE A CLAIM FOR PROMISSORY ESTOPPEL.**

Instead of demonstrating that its Complaint states a viable claim for promissory estoppel, Plaintiff contends that it should not be required to provide additional factual support for its claim at this stage. [Resp. at 33.] Defendants moved to dismiss Plaintiff's promissory estoppel claim not solely because its supporting factual allegations are deficient (although they are), but because those factual allegations, even if true, ***do not state a claim for promissory estoppel***. [Mot. 16-17.] The statements described in the Complaint do not demonstrate that United made a specific and definite promise on which Plaintiff could reasonably rely as a commitment to future action, and as a result, its promissory estoppel claim should be dismissed. *E.g.*, *Walker v. Walker*, No. 14-18-00569-CV, 2020 WL 1951631, at *3 (Tex. App.—Houston [14th Dist.] Apr. 23, 2020, no pet.).

F. **PLAINTIFF IS NOT ENTITLED TO STATUTORY PROMPT PAYMENT PENALTIES.**

Plaintiff concedes that it is an out-of-network provider, so for Sections 843.351 and 1301.069 of the Texas Insurance Code to apply to its claims, the COVID diagnostic testing it provided must be "care related to an emergency or its attendant episode of care as required by state

or federal law." *See Emergency Health Ctr. at Willowbrook, L.L.C. v. UnitedHealthcare of Tex., Inc.*, 892 F. Supp. 2d 847, 852-53 (S.D. Tex. 2012) (granting summary judgment on prompt payment act claim where out-of-network provider could not prove it was required by state or federal law to provide emergency services). Section 1301.155 of the Texas Insurance Code defines "emergency care" as "health care services provided in a hospital emergency facility, freestanding emergency medical care facility, or comparable emergency facility to evaluate and stabilize medical condition of a recent onset and severity[.]" *See also* TEX. INS. CODE § 843.002(7). COVID diagnostic testing is not "emergency care" as defined by and used in the Texas Prompt Pay Act. Plaintiff cannot bypass this requirement of the Prompt Pay Act by asserting that the FFCRA and the CARES Act were enacted in response to a "national emergency." For this reason alone, Plaintiff's Prompt Pay Act claim must be dismissed.

But, more importantly, even if Plaintiff's services were "related to an emergency or its attendant episode of care" (they are not), Texas law is clear that "the penalties under the prompt payment statute are **not available to out-of-network providers**." *Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 620 S.W.3d 458, 469 (Tex. App.—Dallas 2021, pet. filed) (emphasis added). The penalty structure depends on the "**contracted right of reimbursement** to the provider." *Id.* (emphasis added). As an out-of-network provider, Plaintiff has no contract with Defendants and is therefore not entitled to an award of penalties under the Texas Prompt Payment Act.

Plaintiff does not dispute these authorities, but argues that the CARES Act's reference to a provider's cash price listed on its website should be used in place of the term "contracted rate" in the Prompt Pay Act. Plaintiff has not identified any authority in support of this argument, and **none exists**. As discussed above, the FFCRA and CARES Act were not intended to give providers such as Plaintiff a private right of action, and they certainly do not reflect any intent to rewrite the Texas

Insurance Code's provisions regarding statutory penalties. For this additional reason, Plaintiff's claim under the Texas Prompt Pay Act should be dismissed.

### G. PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE RELIEF OR A DECLARATORY JUDGMENT

Plaintiff contends that its claims for injunctive relief and declaratory judgment should not be dismissed because, in addition to monetary damages, it "is also seeking relief from for [sic] United's failure to provide a full and fair review and for its racketeering activities." [Resp. at 34.] But seeking an equitable remedy does not entitle Plaintiff to injunctive relief or a declaratory judgment. *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 240 (5th Cir. 2019) ("Equitable remedies typically take the form of 'an injunction or specific performance,' and are typically affirmatively sought and 'obtained when available legal remedies cannot adequately redress the injury.'"). Plaintiff's Complaint fails to state a substantive claim that would entitle it to declaratory judgment, much less show a likelihood of success on the merits of any substantive claim such that it is entitled to injunctive relief. As a result, Counts V and X of the Complaint should be dismissed.

### III. CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court grant the Motion and dismiss the claims described above with prejudice, and grant such other and further relief as may be necessary.

| | |
|---|---|
| Dated: November 19, 2021 | By: */s/ Andy Jubinsky*<br>Andrew G. Jubinsky<br>*Attorney in Charge*<br>Texas Bar No. 11043000<br>S.D. Tex. No. 8603<br>andy.jubinsky@figdav.com<br>Don Colleluori<br>Texas Bar No. 04581950<br>S.D. Tex. No. 8598<br>don.colleluori@figdav.com<br>Amber D. Reece<br>Texas Bar No. 24079892<br>S.D. Tex. No. 2695252<br>amber.reece@figdav.com<br><br>**FIGARI + DAVENPORT, LLP**<br>901 Main Street, Suite 3400<br>Dallas, Texas 75202<br>T: (214) 939-2000<br>F: (214) 939-2090<br><br>**ATTORNEYS FOR DEFENDANTS**<br>**UNITED AND THE EMPLOYER PLANS** |

## **CERTIFICATE OF SERVICE**

  I hereby certify that on November 19, 2021, this document was served, via email, through the Court's electronic filing system on all attorneys deemed to accept electronic service.

            */s/ Andy Jubinsky*
            Andy Jubinsky