United States District Court
Southern District of Texas
**ENTERED**
January 18, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| DIAGNOSTIC AFFILIATES OF NORTHEAST HOU, LLC, | § § § | |
| Plaintiff, | § § § | |
| VS. | § | CIVIL ACTION NO. 2:21-CV-00131 |
| UNITED HEALTH GROUP, INC., *et al.*, | § § § § | |
| Defendants. | § | |

## ORDER ON MOTION TO DISQUALIFY COUNSEL

Plaintiff Diagnostic Affiliates of Northeast Hou, LLC d/b/a 24 Hour Covid RT-PCR Laboratory (Diagnostic Affiliates) filed this action to recover payments for COVID-19 testing and related services against three categories of Defendants: (1) UnitedHealth Group, Inc. (UHG), the parent company of subsidiaries that administer health insurance plans; (2) health insurance plan insurers or administrators, collectively referred to as United;[1] and (3) employer healthcare plans that are insured and/or administered by United.[2]

---

[1] "United" refers to: United Healthcare Services, Inc., United Healthcare Benefits of Texas, Inc., United Healthcare of Texas, Inc., UMR, Inc., and OptumHealth Care Solutions, LLC (sued as OptumHealth Care Solutions, Inc.).

[2] "Employer healthcare plans" refers to: American International Group, Inc. Medical Plan; Anadarko Petroleum Corp. Health Benefit Plan; Apple Inc. Health And Welfare Benefit Plan; Group Health And Welfare Plans (Aramark Uniform Services); AT&T Umbrella Benefit Plan No. 1; AT&T Umbrella Benefit Plan No. 3; Baker Hughes, A GE Company Welfare Benefits Plan; Baylor College Of Medicine Health And Welfare Benefits Plan; Brookdale Senior Living, Inc. Welfare Plan; C.H Robinson Company Group Health Major Medical Plan; Calpine Corporation Employee Benefit Plan; Caterpillar Inc. Group Insurance Master Trust; Celanese Health And Welfare Benefits Program; Centerpoint Energy Group Welfare Benefits Plan For Retirees; Citgo Petroleum Corporation Defined Contribution Master Trust; **Delta Account Based Healthcare Plan**; **Envision Healthcare Corporation Welfare Benefits Plan**; H&E Equipment Services Inc. Benefit Plan; Flour Employee Benefit Trust Plan; Fresenius Medical Care Travelling Nurses Health And Welfare Benefits Plan; Geico Corp. Consolidated Welfare Benefits Program; **Geospace Technologies Welfare Benefit Plan**; Hudson Group (HG) Inc. Employee Benefits Plan; IQOR Health And Welfare Plan; Jones Lang Lasalle Group Benefits Plan; Kellogg Brown & Root, Inc, Welfare Benefits Plan; Kinder Morgan,

Before the Court is Diagnostic Affiliates' Motion for Disqualification of Counsel Figari + Davenport, LLP (Figari), which represents UHG, United, and most of the employer plans. D.E. 104.

Diagnostic Affiliates alleges irreconcilable and nonconsentable conflicts of interest among Defendants that are so "manifest and glaring" and "open and obvious" that this Court is compelled to intervene in the interest of the fair and efficient administration of justice to disqualify the attorneys from representing any of the parties. D.E. 104. Defendants respond that Diagnostic Affiliates merely seeks to divide and conquer Defendants and has no standing to do so. Moreover, any conflict has been disclosed and is the subject of client consents. D.E. 129. Diagnostic Affiliates has replied. D.E. 142.

For the reasons set out below, the Court **DENIES** the motion.

## JURISDICTION AND STANDING

This Court has federal question subject matter jurisdiction because several federal

---

Inc. Master Employee Welfare Plan; Lexicon Pharmaceuticals Inc. Comprehensive Welfare Benefits Plan; Lineage Logistics LLC Benefits Plan; Lockton, Inc. Welfare Benefits Plan; M/I Homes, Inc. Health, Life And Dental Welfare Plan; Maersk Inc. Active Nonunion Health And Welfare Plan; The Mallinckrodt Pharmaceuticals Welfare Benefit Plan; Motiva Enterprises LLC Health and Wellness Benefit Plan; Novo Nordisk Inc. Welfare Benefit Plan Petsmart Smartchoices Benefit Plan; Procter And Gamble Retiree Welfare Benefits Plan; Railroad Employees National Health Flexible Spending Account Plan; Raising Canes USA Health And Welfare Benefits Wrap Plan; Republic Services Inc. Employee Benefit Plan; Republic National Distributing Company, LLC Welfare Benefits Plan; Saia Motor Freight Line LLC Employee Preferred Provider Plan; Siemens Corporation Group Insurance And Flexible Benefits Program; Skadden, Arps, Slate, Meagher & Flom Partners' Welfare Benefits Plan; Skywest Inc. Cafeteria Plan; Southwest Airlines Co. Welfare Benefit Plan; Spirit Airlines Inc. Health And Welfare Benefits Plan; Swissport North America Holdings, Inc. Health & Welfare Plan; Targa Resources LLC Welfare Benefits Plan; Texas Capital Bancshares Inc. Employee Benefit Plan; Textron Non-Bargained Welfare Benefits Plan; Adecco, Inc Welfare Benefits Plan; T-Mobile USA, Inc. Employee Benefit Plan; Transocean Group Welfare Benefit Plan; UHS Welfare Benefits Plan; UnitedHealth Group Ventures, LLC Health And Welfare Benefit Plan; Valero Energy Corporation Retiree Benefits Plan; Valmont Industries Inc. Welfare Benefit Plan; Walgreens Health And Welfare Plan; WCA Management Company, LP Welfare Benefit Plan; Webber, LLC Welfare Benefit Plan; Winstead PC Flexible Benefit Plan; Group Benefits Plan For Employees Of Worleyparsons Corporation. Of those that have appeared to date, only those listed in bold are separately represented.

statutes are squarely in issue: the FFCRA;[3] the CARES Act;[4] ERISA;[5] and RICO.[6] 28 U.S.C. § 1331. Personal jurisdiction has been conceded. D.E. 95, p. 3. However, Defendants have raised the question of standing with respect to the motion to disqualify. Standing is a jurisdictional matter to be addressed at the outset. *See Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006)); *see also California v. Tex*as, 141 S. Ct. 2104, 2113 (2021) (referencing the case or controversy requirement of Art. III, § 2).

Ordinarily, a plaintiff's standing is based on the allegation of a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp.*, 547 U.S. at 342 (internal quotation marks omitted); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992). However, different rules apply when the question is whether attorneys are acting in a manner consistent with ethical restraints.

Defendants argue that where the issue is a matter of a conflict of interest among an attorney's clients, the issue may be raised only by the aggrieved client. *See In re Yarn Processing Patent Litig.*, 530 F.2d 83 (5th Cir. 1976). However, three months prior to the

---

[3] Families First Coronavirus Response Act, Pub. L. No. 116-127, § 6001(a), 134 Stat. 178 (2020) (relating to 42 U.S.C. § 1320b–5 NOTE, authority to waive peer review and administrative requirements during national emergencies).

[4] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 3202(a) 134 Stat. 281 (relating to 42 U.S.C. § 256b, primary health care drug pricing agreements).

[5] Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*.

[6] Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.

opinion in *Yarn Processing*, the Fifth Circuit determined that an attorney's ethical violations can be raised by an opponent:

> The substance of the government's motion was that appellant had violated the ethical canons of the American Bar Association, which prohibit a lawyer from representing parties with adverse interests. These ethical canons had been explicitly adopted by the local rules of the district court in which this action arose. ***When an attorney discovers a possible ethical violation concerning a matter before a court, he is not only authorized but is in fact obligated to bring the problem to that court's attention.*** Nor is there any reason why this duty should not operate when, as in the present case, a lawyer is directing the court's attention to the conduct of opposing counsel. In fact, a lawyer's adversary will often be in the best position to discover unethical behavior. We also conclude that ***the trial judge had jurisdiction to act upon this claim of unethical conduct***. Local rules whose validity is not challenged expressly incorporate the American Bar Association's ethical canons and expressly give the district court the power to fashion sanctions. Furthermore***, it is beyond dispute that lawyers are officers of the court and that the courts have the inherent authority to regulate their professional conduct***.

*In re Gopman*, 531 F.2d 262, 265–66 (5th Cir. 1976) (citations and footnotes omitted) (emphasis added); *see also Brown & Williamson Tobacco Corp. v. Daniel Int'l Corp.*, 563 F.2d 671, 673 (5th Cir. 1977). The *Yarn Processing* opinion likewise recognized that an opponent could complain of an attorney's conflict of interest under appropriate circumstances, but that those circumstances no longer existed in that case.

  A distinguishing fact between *Gopman* and *Yarn Processing* was that, in *Yarn Processing*, the client—who first identified a conflict in his attorney's handling of the case for another party—had been dismissed from the case and was no longer pressing the issue.

Thus, there were no divergent issues for conflict purposes before the Court. In *Gopman*, the government complained of an attorney representing multiple different union officials in an active grand jury criminal investigation. More like *Gopman*, the conflict of interest here involves subsets of Defendants who remain parties to this case. Diagnostic Affiliates therefore has standing to raise the issue and this Court has jurisdiction to decide it.

## STANDARD OF REVIEW

**General Standard and Burden of Proof**. Disqualification of an attorney is a matter committed to the court's sound exercise of discretion. *F.D.I.C. v. U. S. Fire Ins. Co.*, 50 F.3d 1304, 1310 (5th Cir. 1995) (citing *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992)). Findings of fact are reviewed under the clearly erroneous standard and the application of ethical standards is subject to "careful examination" or de novo review. *Id.* at 1310-11. The party seeking disqualification bears the ultimate burden of proof. *See Forsyth v. Barr*, 19 F.3d 1527, 1546 (1994); *Galderma Labs., L.P. v. Actavis Mid Atl. LLC*, 927 F. Supp. 2d 390, 398 (N.D. Tex. 2013). However, if properly placed in issue, the attorney bears the burden of showing informed consent. *See Galderma*, 927 F. Supp. 2d at 398.

**Caution When Brought by Opponent**. Motions to disqualify that are brought by an opposing party rather than by a client are viewed with significant caution.

> A disqualification inquiry, particularly when instigated by an opponent, presents a palpable risk of unfairly denying a party the counsel of his choosing. Therefore, notwithstanding the fundamental importance of safeguarding popular confidence in the integrity of the legal system, attorney disqualification,

> particularly the disqualification of an entire firm, is a sanction that must not be imposed cavalierly.

*F.D.I.C.*, 50 F.3d at 1316; *see also Yarn Processing*, 530 F.2d at 90 (noting that strong presumptions in the analysis designed to favor a complaining client are inappropriate in the hands of an opponent).

Elaborating on this problem in view of the rules of professional responsibility, the Fifth Circuit wrote:

> As noted in the comments to both the Model Rules and the Texas Rules, an opponent may be tempted to invoke the disqualification rule for purposes of harassment. Unhappily, as often as the rule is misused, the profession is disserved. When, for purely strategic purposes, opposing counsel raises the question of disqualification, and subsequently prevails, public confidence in the integrity of the legal system is proportionately diminished. "Indeed, the more frequently a litigant is delayed or otherwise disadvantaged by the unnecessary disqualification of his lawyer under the appearance of impropriety doctrine, the greater the likelihood of public suspicion of both the bar and the judiciary."

*F.D.I.C.*, 50 F.3d at 1316 (quoting *Woods v. Covington Cnty. Bank*, 537 F.2d 804, 813 (5th Cir. 1976)).

While nothing in these proceedings suggests that disqualification is sought for the purpose—specifically—of harassment, it is clear that Diagnostic Affiliates stands to gain a strategic advantage in making the challenge. It blames the Defendants' united front (pun unavoidable) under the supervision of the Figari firm for standing in the way of obtaining individual settlements with the employer healthcare plans. Those settlements not only resolve a subset of reimbursement claims, but they add pressure on the United Defendants

to bear greater responsibility for their alleged wrongful conduct. *See* D.E. 104, p. 3.[7] Therefore, the Court proceeds with caution.

**General Rubric**. Motions to disqualify are "substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law." *In re Am. Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992). Federal courts may adopt state or American Bar Association (ABA) rules as their ethical standards, but whether and how those rules are to be applied is a question of federal law. *Id.* Pursuant to Local Rule for the Southern District of Texas 83.1(l) and Appendix A, minimum standards of professional conduct are governed by the Texas Disciplinary Rules of Professional Conduct. However, "the court is not limited by that code." Appendix A, Rule 1.

Our sister court in the Northern District of Texas has recently noted that the rules to be applied include the American Bar Association's Model Rules of Professional Conduct:

> Disqualification decisions in this Court are guided by state and national ethical standards adopted by the Fifth Circuit. In the Fifth Circuit, the source for the standards of the profession has been the canons of ethics developed by the ABA. Additionally, consideration of the Texas Disciplinary Rules of Professional Conduct is also necessary because they govern attorneys practicing in Texas generally. District courts also consider, when applicable, local rules promulgated by the local court itself.

---

[7] Diagnostic Affiliates writes, "Plaintiff has attempted to resolve these disputes directly with self-funded health plans administered by United, including many of the Employer Plans, but has been prevented from moving forward on individual resolutions after the Employer Plan retained Figari as it pertains to this matter. As shown below, for self-funded health plans that have chosen independent counsel that is separate from the influences of Figari and United, the self-funded health plan have: (i) conducted their own independent investigations; (ii) concluded that their members' claims were not adjudicated in accordance with the FFCRA and the CARES Act; and (iii) have become materially and directly adverse towards United."

*Texas v. Biden*, 4:21-CV-0579-P, 2021 WL 5115608, at *5 (N.D. Tex. Nov. 3, 2021) (citations omitted).

The rules are not applied mechanically or in an inflexible manner because to do so would frequently "abrogate important societal rights, such as the right of a party to his counsel of choice and an attorney's right to freely practice her profession." *F.D.I.C.*, 50 F.3d at 1314 (citing *Woods*, 537 F.2d at 813); *Church of Scientology of Cal. v. McLean*, 615 F.2d 691, 693 (5th Cir. 1980). With respect to a challenge based on an alleged conflict of interest, the court considers, "(1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety will occur, and (3) [whether] the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case." *Dresser*, 972 F.2d at 544; *F.D.I.C.*, 50 F.3d at 1314.

## FACTS

The amended complaint alleges nine counts as follows:

- Count I: Violation of the FFCRA and the CARES Act - against all Defendants;
- Count II: Violation of ERISA for failure to pay provider charges with or without an assignment of benefits - against all Defendants;
- Count III: Violation of ERISA for failure to provide a full and fair review of the claims - against all Defendants;
- Count IV: Violation of RICO - against United;
- Count V: Request for a declaratory judgment - against United;
- Count VI: Claim for unjust enrichment and quantum meruit - against United:
- Count VII: Claim for promissory estoppel - against United;

> Count IX:[8]  Violation of the Texas Prompt Payment of Claims Act[9] - against United; and
>
> Count X: Claim for injunctive relief - against United.

D.E. 2, pp. 72-86. Diagnostic Affiliates' motion to disqualify counsel is predicated on the conflict of interest that allegedly exists between UHG/United and the employer plans that it insures and/or administers with respect to both the first three counts alleged against all categories of Defendants and with respect to the RICO claim in which the employer plans are alleged to qualify as a criminal enterprise. *See* 18 U.S.C. §§ 1961(4), 1962(c).

Diagnostic Affiliates states that "United has been a loyal and trusted client of Figari's for nearly two decades." D.E. 104, p. 3. This involves representation since 2008 in 87 cases. *Id*. p. 9 & n.18. At the same time, United "serves in the trusted role of third-party claims administrator for self-funded health plans, including the Employer Plans." *Id*., p. 2. Diagnostic Affiliates does not state whether Figari has also represented any of the employer plans in a similar number of cases over a similar amount of time or in any cases brought jointly against the plan and United.

As a result of the claims made in this case, Diagnostic Affiliates contends that

> any reasonable attorney would come to the same conclusion that Figari can never provide the same level of loyalty to Employer Plans in this action than it has and will to continue to provide to United especially given the fact that any liability found against United through an independent investigation and/or through litigation would result in actionable claims against United by the Employer Plans and/or members of the Employers Plans.

---

[8]  The amended complaint does not include a Count VIII.

[9]  Texas Insurance Code §§ 843.351 and 1301.069.

*Id.*, pp. 3-4.

## DISCUSSION

In keeping with the *Dresser* rubric, the Court considers the three enumerated areas of inquiry. The first two identify the existence of a conflict or the appearance of impropriety and the third addresses the balance between any impropriety and societal interests served by the lawyer's continued joint representation.

### A. Conflict or Appearance of Impropriety

**Reimbursement Claims**. According to Diagnostic Affiliates' briefing, there appear to be two levels of potential conflict in this case. The first is with respect to its reimbursement claims under its first three counts, alleged against all Defendants. It suggests, based on its experience with one self-funded health plan, that if the employer health plans have independent counsel, they will conclude that United has not complied with the law and will settle with Diagnostic Affiliates. It goes on to suggest that those plans will then pursue their own remedies against United or at least put increasing pressure on United to pay Diagnostic Affiliates' claims. Because of Figari's loyalty to United, the argument continues, it cannot properly represent the adverse interests of the employer healthcare plans.

But Diagnostic Affiliates' argument is speculative, presuming a realignment of parties that is inconsistent with their respective interests as to the reimbursement claims. The crux of this case is whether Diagnostic Affiliates can lawfully charge a price for COVID-19 testing that is—according to Defendants—approximately ten times more than

an appropriate amount and whether the claims were properly supported and documented. On this dispute, United and the employer healthcare plans are properly aligned together against Diagnostic Affiliates.

All Defendants have a common interest in protecting plan assets from charges that are excessive, mistaken, or fraudulent. The decision as to whether the claims must be reimbursed affects them all in a comparable way in relation to Diagnostic Affiliates. And there is a conceivable benefit to their joint representation, both in cost-savings and in creating a formidable joint opposition.

To find the conflict of interest that Diagnostic Affiliates advances, the Court has to presume that Diagnostic Affiliates' claim is correct and that there are no terms in the agreements between United and the employer healthcare plans—whether in plan insurance, plan administration, or joint representation agreements—that adequately anticipate and address the parties' respective rights and responsibilities in that regard. Any such presumption is unwarranted under the evidence.

As Figari points out, the employer healthcare plans are sponsored by large corporations with significant resources and sophisticated counsel. There is no reason to assume that they will be caught unaware in an unanticipated conflict that affects the administration of their interests in this case. And, as a matter of fact, there are terms in agreements between Defendants as to their respective liabilities on claims of the sort made here. *See* Affidavit of Zona, D.E. 129-2, pp. 2, 10-11. That evidence is uncontroverted.

Diagnostic Affiliates' own briefing of the applicable ethical rules reveals a number of factual questions relevant to finding a conflict of interest. And it has offered no evidence on those fact issues. As the *Yarn Processing* opinion noted, presumptions that might work in favor of a client complaining of his own lawyer do not belong in the hands of an opponent. 530 F.2d at 90.

For instance, there may be a conflict where there is a "substantial discrepancy in the parties' testimony, incompatibility in positions in relation to an opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question." D.E. 104, p. 12 (quoting Texas Rule of Disciplinary Conduct 1.06, comment 3 and Model Rule 1.7, comment 23). But Diagnostic Affiliates has not offered any evidence of discrepancy in testimony. There appears to be no incompatibility of their positions vis-à-vis Diagnostic Affiliates. And they have expressly chosen to fight Diagnostic Affiliates together, suggesting that they anticipate better, or more cost-effective, results acting as a single bloc.

Diagnostic Affiliates quotes other comments to ethical rules, such as the one condemning dual representation if "the lawyer reasonably appears to be called upon to espouse adverse positions in the same matter or a related matter." D.E. 104, p. 12 (quoting Texas Rule 1.06, comment 6). There is no evidence of any adverse positions required in litigating this case. And the clients have not been shown to be "aligned directly against each other" in this proceeding. *See Id.* (quoting Model Rule 1.7, comment 17). While Diagnostic Affiliates wants to instigate a scenario where Defendants are aligned against

each other, that is not the current scenario. The prospects of a realignment happening without the involvement of new counsel are not sufficiently concrete to declare a conflict of interest at this stage of the proceedings.

Diagnostic Affiliates' arguments regarding United's treatment of requests for information from plan participants is a red herring. *See* D.E. 104, p. 15. Plan participants are not parties to this litigation. There is no legal or analytical basis for making their interests proxies for the interests of the plans in litigation brought by a healthcare provider. Those insured by an employer healthcare plan have interests that can align with the healthcare provider as easily as they can align with the plan and its administration. So it makes no sense to conflate the interests of the members with those of the plans.

The argument that disclosure of United's confidential information would be required to properly represent the employer healthcare plans is conclusory. *See* D.E. 104, p. 16. Diagnostic Affiliates provides no detail as to what information would be required or why. And while Diagnostic Affiliates complains of United giving self-funded health plan clients conflicting information regarding the reimbursable amount of COVID-19 testing services, it does not show how that creates a conflict of interest among Defendants in relation to Diagnostic Affiliates. *See* D.E. 104, pp. 16-18.

Diagnostic Affiliates also seeks to analogize conflicts of interest created in an insurance company's simultaneous representation of a driver and a passenger in an automobile collision. D.E. 104, pp. 18-19. But the analogy does not apply. Drivers and passengers simply do not enter into pre-trip agreements regarding the operation of the

13 / 17

vehicle in advance, with provisions for indemnity, as evidenced here. And the allegedly injured claimant here is not the passenger, but the opposing driver.

Diagnostic Affiliates has not demonstrated that there is a conflict of interest among Defendants with respect to the reimbursement claims alleged under the first three counts in the complaint. To the contrary, Figari has shown that there is no conflict to begin with and that Defendants have agreements that govern the allocation of responsibility for claims raised against them jointly. And there is nothing to raise an eyebrow in their joint defense against Diagnostic Affiliates. Thus, there is no actual conflict or appearance of impropriety arising with respect to the reimbursement claims.

**RICO/Enterprise**. The second alleged conflict arises out of the RICO allegations against United, wherein Diagnostic Affiliates takes the position that United has used the employer healthcare plans as an enterprise. In that regard, it cites a civil RICO case, *Kaiser v. Stewart*, CIV. A. 96-6643, 1997 WL 186329 (E.D. Pa. Apr. 10, 1997) for the proposition that conflicts prohibited a single firm's representation of 14 co-defendants without affidavit evidence of waivers.

*Kaiser* is distinguishable because the RICO claims here are made only against the United Defendants, not the employer healthcare plans. And Diagnostic Affiliates is only concerned with the representation of the employer healthcare plans, not any conflict involved in representing multiple United entities. It is not clear, and Diagnostic Affiliates has not tried to explain, how RICO claims asserted only against United create a conflict of

interest for the attorneys who also represent the plans, simply by virtue of alleging that United used the plans as an enterprise.

Even if there were a potential conflict, the *Kaiser* opinion does not support disqualification.

> It is not for the court to second guess decisions of the various defendants in this case. They also know their respective situations better than does the court. For one thing, the lawsuit is and will continue to be extremely expensive both to pursue and to defend. The case, still in the pleading stage, already has some 94 docket entries. Inevitably, it will involve complicated legal and accounting issues as well as massive discovery. We are not going to compel a party to engage separate counsel it may not be able to afford, if the party understands the "implication of common representation and the advantages and risks involved."

1997 WL 186329, at *4 (citations omitted). In the end, despite the allegations of conflict of interest, the *Kaiser* court permitted joint representation upon proof of informed waiver. Here, because allegations of conflicts of interest are not adequately substantiated, the Court need not reach the informed waiver issue.

The citation of *Wittenborn v. Pauly*, No. 87 C 5814, 1988 WL 33723, at *5 (N.D. Ill. Apr. 1, 1988) is incomplete. Diagnostic Affiliates represents it to be a multiple-defendant RICO case in which common representation of the defendants was prohibited. But the reason for finding a conflict was that it was a shareholder derivative suit in which there was an inherent conflict of interest between a corporate director and the corporation he served. There are no shareholder derivative allegations here. And Diagnostic Affiliates

has failed to show that any set of Defendants can prevail only at the expense of other Defendants.

Reliance on *McGinn v. DeSoto, Inc.,* No. 90 C 4481, 1990 WL 251753, at *1 (N.D. Ill. Dec. 21, 1990) is also misplaced. That opinion states that the ERISA plan fiduciaries were in a relationship with the plan such that the case was akin to a shareholder derivative suit where disqualification for a conflict was necessary. But before this Court can apply the holding of that case, it must determine the nature of the claims, which is not apparent in the disqualification opinion.

The nature of the *McGinn* claims can, however, be found in an earlier opinion in the same case. *See McGinn v. DeSoto, Inc*., No. 90 C 4481, 1990 WL 186212, at *1 (N.D. Ill. Nov. 14, 1990). There, it is readily apparent that the company's employees sued the company, the ERISA plans, and the plan fiduciaries for mishandling a common stock fund into which employees had contributed for investment purposes. The plan fiduciaries were charged with having mishandled the fund for the purpose of staving off a hostile takeover and securing their own positions in the company. Those allegations are nothing like the allegations here, where the question is whether the Diagnostic Affiliates' claims are properly reimbursable from plan assets. The shareholder derivative analogy does not apply here.

Diagnostic Affiliates has not demonstrated that the RICO claim against United presents an actual conflict preventing the joint representation of all Defendants. Neither

has it shown that there is an appearance of impropriety arising out of the nature of the relationships between the parties.

### B. Balancing Public Suspicion Against Societal Interests

Because Diagnostic Affiliates has not demonstrated any true conflict of interest in Figari's representation of both sets of Defendants, and because the case allegations are not such as to create a glaring or obvious concern about joint representation, it is clear that the societal interest prevails—the interest in a litigant's right to choose its own counsel and present a joint defense against a common adversary.

The Court finds that the suggestion of a potential conflict of interest is insufficient under this record to require disqualification of Figari.  And because no imminent conflict has been shown, the Court need not inquire further whether the conflicts are waivable or whether the waiver of conflicts that Figari has averred that its clients have provided are adequate.

## CONCLUSION

For the reasons set out above, the Court **DENIES** Diagnostic Affiliates' motion to disqualify Figari as counsel for Defendants.  D.E. 104.

ORDERED on January 18, 2022.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE